ENVIRONMENTAL PRESERVATION COMPANY, B. ROLAND FREASIER, JR., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Environmental Preservation Co. v. Commissioner
Docket No. 27808-89
United States Tax Court
T.C. Memo 1992-100; 1992 Tax Ct. Memo LEXIS 99; 63 T.C.M. (CCH) 2117; T.C.M. (RIA) 92100; February 19, 1992, Filed *99 Decision will be entered for respondent. John F. Kelly and Michael J. Kelly, for Estate of Alvin Q. Jarrett, * participating partner. William Rinquette, for respondent. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: By notice of final partnership administrative adjustment dated August 21, 1989, respondent determined that Environmental Preservation Co. (EPC) on its 1984 partnership return overstated the value attributable to its charitable contribution of certain real property. Respondent also determined that the partnership interest held by one of the partners of EPC *100 was other than reported on EPC's 1984 return. The only issues for decision are: (1) Whether the Goodwin Islands, contributed by EPC to the Endowment Association of the College of William and Mary in Virginia, Inc., on December 21, 1984, had a fair market value of $ 5,067,350 as claimed on its 1984 return or a lesser value, as determined by respondent; and (2) whether one of EPC's partners, Environmental Preservation Development, Inc. (EPD), was liquidated prior to the contribution of the aforementioned property. FINDINGS OF FACT Some of the facts have been stipulated and are so found; the stipulation and the accompanying exhibits are incorporated herein by this reference. EPC is a Virginia limited partnership, whose legal address at the time the petition was filed was in Richmond, Virginia. EPC filed its returns on a calendar-year basis. EPC's partners and their respective interests, prior to the alleged liquidation of one its partners, EPD, were as follows: General Partner
Percentage
EPD
40%
Limited Partner Class "A"
EPD
20%
Alvin Q. Jarrett
15%
B. Roland Freasier, Jr.
15%
Limited Partner Class "B"
Goodwin Islands Development Co.
10%
1. Goodwin Islands
*101 EPC conveyed the Goodwin Islands (Islands or property) to the Endowment Association of the College of William and Mary in Virginia, Inc. (Endowment Association), by deed of gift dated December 21, 1984. The parties are in agreement that the conveyance qualified as a charitable contribution under section 170(c). The Goodwin Islands are situated in York County, Virginia. York County is located 25 miles northwest of Norfolk and 50 miles southeast of Richmond. York County is primarily a "bedroom community" for the Virginia Peninsula, which also includes the cities of Newport News, Hampton, and Williamsburg; the town of Poquoson; and the County of James City. The population of York County in 1983 was 37,807. The Goodwin Islands are bounded by the mouth of the York River to the north, the Chesapeake Bay to the east, and a narrower body of water called the Thorofare to the south and west. The portion of the York River to the north of the property has a deep channel that allows the passage and turnaround of ocean-going vessels. The Islands lie approximately 26 miles from the Port of Norfolk, Virginia. Upstream from the Islands are located the United States Naval Weapons Station *102 at Cheatham Annex, an Amoco refinery (established 1956), and a generating plant owned by the Virginia Electric Power Co. (established 1955). With respect to the mainland, the Islands are bounded on the west and the southwest by Goodwin Neck Estates and Seaford, respectively, both being residential communities with little industry. The Islands are separated from the mainland by a distance of one thousand feet at the nearest point, and are accessible only by boat. The Goodwin Islands comprise 16 islands covering a total of 600 acres of fastland (dry ground) and marsh. The largest island (main island) of the chain is wooded in part, lies the furthest west of all the Islands, and is the only island in the chain that has any development potential. A processing plant for menhaden fish caught in the Chesapeake once operated there. The soils located on the main island are not acceptable for percolation nor recommended for septic tank drain fields. The parties agree that the Goodwin Islands comprise 600 acres. However, no survey has been undertaken to determine the amount of developable acreage on the main island. According to the York County and Town of Poquoson Tidal Marsh Inventory, *103 the Goodwin Islands have 293 acres of marsh vegetation, which figure was derived from aerial photographs and topographic maps. According to the U.S. Geological Survey topographic map for the Poquoson West Quadrangle, nearly the entire area of the main island lies below 5 feet in elevation. On the date of the charitable contribution, the Goodwin Islands were zoned M-2, which allows both light and heavy industrial development. The York County Land Use Plan (Plan), adopted January 6, 1983, however, designated the Goodwin Islands as a Resource Management/Protection area, which applied to coastal and inland marshes, areas with slopes in excess of 20 percent, and low-lying floodplains. According to the Plan, "This designation is not necessarily intended to preclude development or use of these areas but rather to explicitly ensure that development, if permitted and attempted, is undertaken with a deliberate and professionally responsive recognition of environmental qualities and conditions." The Plan in describing the Goodwin Islands states: The Goodwin Islands have been designated Resource Management/Protection, as in the original Plan, primarily in recognition of the presence *104 of salt marsh and wetlands, the lack of access and utilities, and the severe flooding potential and extreme wetness. Although several proposals for development of the Goodwin Islands have been aired in the past, this Plan continues to recognize the need to encourage the protection of the surrounding environment from the potentially adverse impacts which intensive development could create. [1]
The property was rezoned in December 1985 to residential/conservation. Despite the subsequent downzoning of the Islands to residential/conservation in 1985, the heavy industry zoning classification, M-2, could have been retained if a permit had been requested prior to the change in zoning. The Islands are also located in an area subject to flooding by the "100-year storm", requiring the first-floor level of any structure be above the 100-year *105 flood level. The Goodwin Islands Development Co. (GIDC), a Virginia limited partnership and owner of the property prior to EPC, attempted to develop the property in the late 1960's and early 1970's. In 1969, GIDC obtained a permit from the Army Corps of Engineers to construct a marina on the main island, but the development was prevented by the Commonwealth of Virginia. The Army Corps of Engineers refused to extend the permit to develop the marina after the permit expired on December 31, 1972, citing as the basis for its refusal the National Environmental Policy Act of 1969. In 1970, the York County Board of Supervisors issued a use permit that allowed GIDC to develop 2,000 condominium units and related recreation facilities on the main island, conditioned on sewer availability. By deed dated May 17, 1977, the Goodwin Islands together with 10 acres of property located on the mainland (mainland property) directly west of the Islands were conveyed by GIDC to EPC. EPC assumed a $ 250,000 deed of trust on the Islands and transferred to GIDC a 10-percent interest in itself. On its 1984 return, EPC reported the basis of the properties acquired from GIDC as $ 310,194. The Code of *106 Virginia requires that property be valued at fair market value for purposes of recordation and the Virginia grantor tax. GIDC recorded the 1977 transfer of the Islands and the mainland property to EPC as involving property worth $ 3 million. In addition, the Commonwealth of Virginia requires local governments to assess real estate at 100 percent of fair market value. In 1978 the property's assessed value was $ 25,000; in 1979 through 1982, $ 1,760,000; and in 1983 and 1984, $ 3,000,000. The assessor for 1979 through 1982 valued the property as follows: 500 acres at $ 3,500 per acre and 100 acres at $ 100 per acre. On a form explaining the 1979 through 1982 assessment, a notation stated that improvement of the property was questionable. For 1983 and 1984, each acre of the property was assessed at $ 5,000. EPC initially intended to market the property without improvement, unless required by the purchaser. However, in early 1984, EPC petitioned York County to rezone the property from heavy industrial to residential/commercial and conservation. It proposed to develop the property into exclusive homesites with a marina/grocery store and a shopping area. Inhabitants of the nearby *107 communities opposed the proposal. Following a hearing on April 10, 1984, the York County Planning Commission, acting upon the suggestion of the Director of Planning and Community of York County, recommended that the rezoning application be denied. On April 27, 1984, EPC was informed that the cost of developing its property as a residential community would be $ 6,164,900, which included installing sewer and water hookups, building roads, and constructing a bridge to the mainland. On May 3, 1984, and prior to final action by the York County Board of Supervisors, EPC withdrew its rezoning request, because it was unlikely to pass. EPC thereafter unsuccessfully tried to sell the property to the Nature Conservancy. Following the abandonment of its rezoning request and after learning of the cost of building a bridge to the mainland, EPC decided to make a charitable contribution of the property, and to sell the mainland property to pay property taxes on EPC's assets. The mainland property was sold by general warranty deed dated December 21, 1984, for $ 110,000. On its 1984 return, EPC allocated a basis of $ 26,316.59 to the mainland property, and reported a long-term capital gain of *108 $ 83,638.41 on the transaction. An appraisal, prepared by Robert F. Ripley (Ripley) for GIDC and dated September 9, 1977, valued the Goodwin Islands and the mainland property at $ 5,177,350. Ripley has been involved in the real estate industry for over 46 years, and has taken numerous courses in the field. Ripley determined that the highest and best use of the property was as a deep water marine terminal. According to Ripley, the Islands were worth $ 4,827,350 and the mainland property $ 250,000. Ripley several years later was engaged by EPC to market the property for $ 5 million, but no sale ensued. In determining the value of the Islands, Ripley relied on the physical characteristics of the property; legal constraints affecting development of the property; certain land sales in the ports of Savannah, Georgia; Charleston, South Carolina; and Jacksonville, Florida; as well as his professional judgment derived from experience in the real estate field. Ripley did not take into account the sale of the property to EPC by GIDC, because he considered it a distress sale. Ripley updated the 1977 appraisal in January of 1985, and he testified herein. The update consisted of two pages *109 and an attachment entitled Market Data Analysis. The update confirmed the value of the properties determined in the 1977 appraisal. The update also mentioned two properties sold in the York River and Hampton Roads area after 1977, which were included to show the appreciation in value of property in the region. Respondent's expert was Brian J. Dundon (Dundon), who began his career as an appraiser in 1986. At the time of trial he had appraised only one property zoned for heavy industry, and had not appraised any other island properties. Dundon determined that the highest and best use of the property was for noncommercial, outdoor recreation activities such as hunting and fishing. Dundon valued the property at $ 360,000 or $ 600 per acre at the time of the charitable contribution, which figure respondent accepted and used in determining EPC's distributable charitable deduction for 1984. Following his determination of highest and best use, respondent's expert used the sales comparison approach to value the property. This approach involves comparing the sales of properties with a similar highest and best use, in this case as noncommercial outdoor recreational property, and adjusting *110 these figures for relevant differences, such as time, location, and size, between the subject property and the comparable property. 2. Liquidation
Environmental Preservation Development, Inc. (EPD), was incorporated in the Commonwealth of Virginia on October 6, 1976. Its principal office was located in Richmond, Virginia, and its registered agent was B. Roland Freasier, Jr. (Freasier). Freasier is a tax attorney and drafted the documents establishing EPD. As noted above, EPD was EPC's sole general partner, and held a 60-percent interest in EPC -- 40 percent as general partner and 20 percent as limited partner. Under the partnership agreement it was responsible for the ordinary management of the partnership. EPD's stockholders in December 1984 were Freasier, Mary M. Parsons, Alvin Q. Jarrett (Jarrett), VCU Tax Award Committee, and the Richmond Christian Day School. [2] Freasier testified that a meeting of the director and the stockholders was held in early December 1984 to elect new officers, including Freasier as president and Gary S. Cook (Cook) as secretary, and to authorize assignment or distribution of EPD's interests in EPC to its shareholders. Moreover, Freasier *111 testified that formal minutes of the meeting were taken, but could not be found at the time of trial. Freasier's testimony was not corroborated by any other evidence. EPC's partnership agreement required the unanimous consent of all the partners to transfer legal ownership of a general partnership interest. A limited partnership interest in EPC could be transferred only with the consent of partners representing 50-percent interest in EPC. Furthermore, EPC's partnership agreement required the execution of an amendment to the Certificate of Limited Partnership, in the case of a transfer of either a general or limited partnership interest. Freasier also testified that the stockholder's meeting of EPD authorized it to execute the documents transferring the Island and the mainland properties. The documents in evidence do not disclose the capacity in which they were executed by EPD, whether as an agent or as general partner of EPC. *112 Each document was executed as follows: ENVIRONMENTAL PRESERVATION COMPANY by ENVIRONMENTAL PRESERVATION
DEVELOPERS, INC. By /s/ B. R. Freasier, Jr. (Seal) President
Attest: /s/ Gary S. Cook Secretary EPD was dissolved by the Commonwealth of Virginia on September 21, 1985. EPC filed its 1984 partnership return on October 10, 1985. On that return it listed its partners and their interests as follows: GIDC 10 percent; EPD 60 percent; Jarrett 15 percent; and Freasier 34.001 percent. EPD filed its 1984 U.S. Corporation Income Tax Return (Form 1120) on September 18, 1985. Notations on both EPD's 1984 return and EPD's 1984 Schedule K-1 from EPC state that the property had been passed to EPD's stockholders as a result of its liquidation. The evidence does not indicate that a Schedule K-1 for the year in issue was prepared for any of the following shareholders of EPD: Mary M. Parsons; VCU Tax Award Committee; or the Richmond Christian Day School. OPINION 1. The Value of the Goodwin Islands
The first issue we address is the fair market value of the Goodwin Islands at the time of their contribution to the Endowment Association on December 21, 1984. *113 Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. This issue is a question of fact to be determined on the entire record, Skripak v. Commissioner, 84 T.C. 285, 320 (1985), [3] and the burden of proof with respect to it is on EPC. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). EPC raises several arguments which we analyze below. We note that the record is wanting in a number of areas, not the least of which is the amount of high ground *114 located on the Islands. The Islands, as indicated, comprise both high ground suitable for some development and marsh. Although no survey of the Islands has been conducted, respondent and EPC agree that the Islands cover 600 acres, and that only the main island offered any possibility of development. They disagree as to how many acres on the main island are high ground. However, based upon our holding as to the property's highest and best use (see infra), we need not determine the amount of high ground or nonwetlands area. [4]
*115 A. Highest and Best Use
The fair market value of property reflects the highest and best use of the property on the relevant valuation date. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). The parties differ over the highest and best use of the property on the date of the contribution of the property to the Endowment Association. EPC asserts that the highest and best use of the main island was as a deep water marine terminal. Respondent, however, contends that the highest and best use was for noncommercial, outdoor recreation activities. The issue, borrowing liberally from Stanley Works v. Commissioner, supra at 401, is whether it is reasonable to conclude that a hypothetical buyer on December 21, 1984, would have considered the Goodwin Islands as the site for the construction of a deep water marine terminal. "The realistic, objective potential uses for the property control the valuation thereof." 885 Investment Co. v. Commissioner, 95 T.C. 156, 167 (1990). The justification for such an approach is that Elements affecting value that depend upon events or combinations of occurrences which, while *116 within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value -- a thing to be condemned in business transactions as well as in judicial ascertainment of truth. [Olson v. United States, 292 U.S. 246, 257 (1934).]
We must determine "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, supra at 255. Such issue presents a problem of judgment, not mathematics. Stanley Works v. Commissioner, supra at 408. Highest and best use has been defined as: "A reasonable and probable use that supports the highest present value as defined as of the effective date of appraisal. Alternatively, that use from among reasonably probable and legal alternative uses found to be physically possible, appropriately supported, financially feasible, and which results in highest land value." * * * [Todd v. United States, 617 F. Supp. 253, 256 (W.D. Pa. 1985) *117 (citation omitted).]
Whether the property is put to the highest use, or whether the owner ever intends to put the property to such use is not relevant to the inquiry. Stanley Works v. Commissioner, supra at 400; Akers v. Commissioner, T.C. Memo. 1984-490, affd. 799 F.2d 243 (6th Cir. 1986). However, "Legal restrictions on the use of property is reasonably probable." Stanley Works v. Commissioner, supra at 402. Both respondent and EPC offered expert appraisals of the property to assist us in determining its fair market value. However, "We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment." Parker v. Commissioner, 86 T.C. 547, 561 (1986). Furthermore, "We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate." Chiu v. Commissioner, 84 T.C. 722, 734 (1985). In the instant case, we are not persuaded by the conclusions of EPC's expert. Ripley, EPC's expert, appears well-qualified to appraise the subject property, having extensive education and experience in the field of real *118 estate. He determined, in his 1977 appraisal and 1985 update of that report, that on the date of the transfer of the property to the Endowment Association the property's highest and best use was as a deep water marine terminal. [5] In reaching this conclusion, he noted that the depth of the channel in the York River just off the Goodwin Islands was deep enough to permit passage and turnaround of large ocean-going vessels, that the property was zoned for heavy industry, and that the island had 168 + acres of developable land. In addition, he based his determination at least in part on his investigation of similarly situated properties (properties on deep water channels being used as marine terminals) in the ports of Charleston, South Carolina; Savannah, Georgia; Jacksonville, Florida; Mobile, Alabama; and Houston, Texas. Comparison of the Islands with these other properties indicated to him that development of the main island as a marine terminal was both feasible and reasonably probable. *119 In further support of his analysis, Ripley, in his 1977 appraisal, asserted that demand for industrial waterfront property in the area was strong, based upon the potential for offshore oil development on the east coast, and the increasing demand for industrial property in York County. He also noted that a marine industrial deep water terminal would not require large volumes of water or produce a significant amount of effluent. In addition, Ripley focused on the presence of other heavy industrial developments in the vicinity of the property, such as the Virginia Electric Power Co. and Amoco complexes; the proximity of the Goodwin Islands to roads and railways; the accessibility of the island by boat; and the island's soil. However, we do not agree with Ripley's conclusion. We note initially that the issue is not how other ports have used such property, but whether the proposed use is likely for this particular property in the near future. Even assuming, arguendo, that these properties were physically comparable, such evidence provides no assurance that it was reasonably probable that the Goodwin Islands, in particular, would or could be similarly developed. At best, such comparisons *120 show that the Goodwin Islands, given their proximity to a deep water channel, might be developed into a deep water marine terminal. However, numerous characteristics of the island appear to preclude that possibility. First, the physical characteristics of the main island appear to preclude development. Although the property may have been located on a river with a deep water channel, only with the construction of a pier nearly 3,000 feet in length would ships drawing 30 feet have been able to use the facility. This limitation, according to Ripley, deterred a prospective buyer, namely Dupont, from acquiring the property. In addition, given the restrictions on development of the wetlands pursuant to the Wetlands Act, Va. Code Ann. sec. 62.1-13.1 to 13.20 (Michie 1987), the presence of extensive wetlands [6] on the main island made development appear infeasible. Ripley, for purposes of his appraisal, did not determine the extent of the wetlands on the Islands nor did EPC offer any other evidence regarding the effect of these wetlands on development. In this regard, we emphasize that no survey of the property has been conducted to determine the amount of wetlands on the large island *121 nor the amount of acreage at various elevations. EPC has not persuaded us that presence of wetlands at the site would not have precluded its development as a deep water marine terminal, for lack of adequate dry ground on which to locate the necessary loading and storage facilities. *122 Furthermore, the soils on the main island are not suitable for percolation nor for the installation of septic tanks. The main island is also low lying, with somewhere in the range of 4.5 acres lying above 5 feet in elevation, and only .25 acres above 10 feet, according to the U.S. Geological Survey topographic map of the Poquoson West Quadrangle, 1983 survey. In addition, the property is subject to flooding by the 100-year storm. In contrast, the other industrial properties in the vicinity -- the electrical plant and the Amoco refinery -- are located on the mainland and on higher ground. Moreover, access to the transportation network in York County would have required the construction of a bridge from the main island, and linkage to the local rail line on the mainland would have required the acquisition of a right-of-way crossing residential property. EPC failed to present persuasive evidence regarding the costs of development and whether the permits necessary to develop the site could have been obtained. Instead, Ripley unpersuasively testified to the effect that, if the site was desired as the location of a terminal, cost of development would be no deterrent. Second, even *123 if the aforementioned factors do not affect the feasibility of developing the site as a deep water marine terminal, it has not been established that demand existed in the area for a facility of this type in the reasonably near future. The other industrial sites in the area were located over a mile away, and had been there since the 1950's. In addition, Ripley testified that most of the tonnage entering and leaving Hampton Roads is handled in the ports of Newport News, Norfolk, and Portsmouth, all located at least 15 miles from the Goodwin Islands. Moreover, the southern ports that Ripley investigated to determine the highest and best use of the property had protected waters and were established ports. The same cannot be said regarding the immediate vicinity of the Goodwin Islands. Furthermore, Freasier, a partner of EPC and EPD's president at the time of the charitable contribution, testified that EPC had attempted to sell the property since its acquisition; and the offshore oil development on the East Coast that may have seemed likely in 1977 had not materialized by the time of the charitable contribution of the Goodwin Islands. The record does not support a finding that there *124 was demand in the reasonably near future for a deep water marine terminal in the vicinity of the property following its transfer to the Endowment Association. Third, attempts to develop the site have been frustrated on a number of occasions. In 1969, GIDC had obtained a permit to develop a marina from the Army Corps of Engineers, but was prevented from acting on it by the Commonwealth of Virginia; and in 1972, the permit was not renewed because of the National Environmental Policy Act of 1972. In 1984, prior to the contribution of the property, EPC had requested a rezoning of the property to residential/commercial, which it later abandoned following local opposition and rejection of the proposal by the York County Planning Commission. We note that in Stanley Works v. Commissioner, 87 T.C. 389, 408 (1986), this Court held that the taxpayer had established that its determination, as to the highest and best use of the property, was reasonably probable, where it had been shown that the site was suitable for that particular use, that the adverse environmental effects associated with such development had not impeded similar development, that environmental opposition *125 would not preclude development, and that demand existed for that use of the property. Here, EPC, in a similar situation, has failed to establish that the site was suitable as a marine terminal, that zoning and environmental laws would not prevent such development, that demand existed for the use of the property, and that it was financially feasible to build thereon. EPC has failed to establish that use of the property as a deep water marine terminal was reasonably probable. Furthermore, based upon the record, EPC has failed to show that respondent's determination that the property's highest and best use was for noncommercial outdoor recreational property was erroneous. Respondent's determination on this point is sustained. B. Comparable Sales
Even if we were to agree that the highest and best use of the property was as a deepwater marine terminal, we are unable to accept EPC's valuation, since its appraisal was far too speculative. First, EPC did not establish the amount of land located on the main island that was not marsh. Second, in employing the comparable sales method, Ripley made no adjustment to the sales prices to account specifically for differences in location *126 of the putative comparable properties, such as the fact that the comparables were all nearer to main ports than the subject property, and that the comparables were not even in the same locality nor even the same state as the Goodwin Islands. Third, Ripley's method of comparison lacked specificity. Ripley testified that, in determining the value of the high ground and low ground on the main island, he "didn't use any specific sale as a comparable. I used the sales to draw a conclusion based on my experience as to what I thought this Goodwin Islands would be in relation to what I found in those other ports". Given these circumstances, EPC's application of the comparable sales method was not probative of the property's fair market value. C. National Oceanic and Atmospheric Administration (NOAA) Award
EPC asserts that "the award made by NOAA to the Commonwealth of Virginia on a 50-50 matching basis to acquire and develop estuary areas as natural field laboratories was an arm's-length transaction of no less probative value than an actual sale of the property". To obtain the aforementioned grant, the fair market value of the property on the date of donation must have been established *127 by an independent appraiser, and certified by a responsible official of the state. 15 C.F.R. sec. 921.81 (1991). NOAA, in acting upon the state's request, accepted the appraisal report prepared by Ripley in 1977 and updated in 1985; and in 1990, NOAA awarded $ 100,240 to the Virginia Institute of Marine Science, a division of the College of William and Mary. EPC claims that we should accept this as proof of the property's value. Respondent argues that the certification by the state official, the Director of the Chesapeake Bay National Estuarine Research Reserve System in Virginia, erroneously embellished Ripley's appraisal of the property, by claiming that the Goodwin Islands were worth over $ 8 million in 1990, and that respondent had accepted Ripley's appraisal. Thus, argues respondent, since NOAA appeared to act on an erroneous fact, we should not accept the award as probative of value. We agree that a recent arm's-length sale of the subject property or the like is probative of fair market value. Kaplan v. Commissioner, 43 T.C. 663, 665-666 (1965); Estate of France v. Commissioner, 18 B.T.A. 442 (1929). The trouble with EPC's argument *128 here is twofold: (a) The transaction was not "recent" (the relevant state of gift here was in 1984, and the award by NOAA was in 1990); and (b) there was no-arm's length sale (the award was made by the Federal Government to an agency of Virginia to support development of the property previously given by the Endowment Association to the Board of Visitors of the College of William and Mary in Virginia). In the circumstances of this case, we find this evidence without probative value, since we are unable to accept Ripley's appraisal, upon which NOAA's valuation of the property was based. See supra. D. Fair Market Value for Purposes of Virginia's Transfer Tax and York County's Property Tax
EPC also asserts that the recordation of the transfer of the property by GIDC to it in 1977 in the amount of $ 3 million and York County's assessment of the property at $ 3 million in 1984 should be determinative of fair market value. This is especially so, it argues, since state law requires property transfers to be recorded at fair market value or the amount of consideration involved if that is greater, and property to be assessed at fair market value. See Va. Code Ann. secs. 58.1-802 *129 and 58.1-3201 (Michie 1991). The assessed value of property is relevant to our inquiry, where state law requires assessment according to fair market value. Estate of Frieders v. Commissioner, 687 F.2d 224, 227 (7th Cir. 1982), affg T.C. Memo. 1980-184. In Estate of Frieders v. Commissioner, T.C. Memo. 1980-184, we held that "This Court has approved the use of such assessments as one indicator of value when * * * the relation between assessed value and fair market value is demonstrated". We note first that there is a considerable discrepancy between the assessed value of $ 3 million and EPC's claimed value of over $ 5 million. We think that the amount recorded for purposes of the grantor tax was questionable in light of York County's valuation of the property prior to its transfer to EPC. In 1978, a year after the sale, the Islands were valued by the assessor at $ 25,000. We also find it surprising for GIDC to have sold the property for an assumption of debt of $ 250,000 and a 10-percent interest in a partnership whose only asset was the property itself, if the property were truly worth at least $ 3 million. Furthermore, *130 despite the fact that GIDC recorded the sale at that price, the property was only assessed at $ 1,760,000 from 1979 through 1982. Additionally, a note on a form explaining the assessment for the years 1979 through 1982 expressed reservations regarding development of the property. During that period, the assessor valued 500 acres at $ 3,500 per acre and 100 acres at $ 100 per acre, even though both parties agree that at most 307 acres were not marsh. Moreover, for purposes of assessment in 1983 and 1984, the property was assessed at $ 5,000 per acre. The rough nature of these assessments casts doubt on their meaningfulness for the determination of value. We note that EPC could have called a member of the assessor's office to testify as to the method of valuation it adopted in valuing EPC's property during those years, but it chose not to. Based upon the record, we are not persuaded that the assessor's valuation represented the fair market value of the Goodwin Islands for the year at issue. [7]
*131 We hold that EPC has failed to bear its burden of proof with respect to the valuation of the Goodwin Islands. 2. Liquidation of Corporate General Partner
The second issue for decision is whether EPD had assigned its interest in EPC to its shareholders prior to the contribution of the Goodwin Islands by gift deed to the Endowment Association on December 21, 1984. The parties have framed the issue in terms of whether EPD had been liquidated prior to EPC's charitable contribution. The resolution of this issue will affect the ultimate tax effect of EPC's charitable contribution in 1984. Whether a corporate liquidation has taken place is a question of fact. Milton v. Commissioner, 33 B.T.A. 4 (1935). A corporate liquidation arises where there is an "intention to liquidate the business coupled with the actual distribution" of assets to the shareholders. Kennemer v. Commissioner, 96 F.2d 177, 178 (5th Cir. 1938), affg. 35 B.T.A. 415 (1937). Liquidation need not be undertaken pursuant to formal resolution, but may be de facto. Kennemer v. Commissioner, supra; Dockum v. Commissioner, 11 B.T.A. 39 (1928); *132 Silverman v. Commissioner, T.C. Memo. 1971-143. Respondent determined that EPD had not been liquidated prior to the contribution of the Goodwin Islands by EPC; on this issue EPC bears the burden of proof. Rule 142(a); Bird Management, Inc. v. Commissioner, 48 T.C. 586, 592 (1967). This Court has used the following test in determining whether there has been a corporate liquidation: "(1) There must be a manifest intention to liquidate; (2) there must be a continuing purpose to terminate corporate affairs; and (3) the corporation's activities must be directed to such termination". Estate of Maguire v. Commissioner, 50 T.C. 130, 142 (1968). EPC argues that, based upon Freasier's testimony and indirect evidence, EPD was liquidated prior to EPC's charitable contribution of the Goodwin Islands. We disagree. The primary problem with EPC's contention regarding the liquidation of EPD is that no persuasive corroborative evidence either by means of document or testimony was introduced to support Freasier's testimony. "The rule is well established that the failure of a party to introduce evidence within his possession and which, *133 if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In this regard, we need merely mention the failure to call Robert F. Ripley, Jr., [8] to testify regarding his advice concerning execution of the deeds transferring EPC's interest in the mainland property and Goodwin Islands, or Gary S. Cook to testify both with respect to EPD's corporate meeting, at which Freasier was made president and during which the liquidation of EPD was allegedly authorized, and with respect to the capacity in which EPD executed the deeds. Nor, as mentioned previously, did EPC introduce the corporate minutes into evidence. [9] Although Freasier's testimony in general was specific in nature, it fails to persuade this Court in light of the utter failure of EPC to corroborate Freasier's testimony. Based on the record, the circumstances described by Freasier are too implausible to accept without corroboration. *134 The documentary evidence regarding EPD's liquidation is unpersuasive. Evidence which stands in favor of liquidation includes EPD's 1984 U.S. Corporation Income Tax Return (Form 1120), executed on September 18, 1985, which has the following language on the bottom of page 4: "Liquidated to Stockholders". In addition, EPC's 1984 K-1 report issued to EPD and filed on or around October 10, 1985, includes the following note: "Land passed to stockholders of Environmental Preservation Dev. Inc. upon liquidation of Corporation". However, upon the liquidation of EPD, only its partnership interest in EPC would have passed to its stockholders, and not the assets of EPC directly. We agree with respondent that these after the fact demonstrations do little to establish that EPD had been liquidated by December 21, 1984. EPC further directs our attention to Freasier's Schedule K-1 which states that Freasier had a 34.001-percent interest in EPC as of the end of 1984 as opposed to a 15-percent interest at the beginning of the taxable year. EPC asserts that this could be the case only if EPD had been liquidated prior to the end of 1984. EPC's evidence is not compelling. We note, initially, that *135 the preparer of both EPD's and EPC's tax returns for 1984 was Jean S. Cothran, and that the partnership return was signed by Freasier. Although Freasier executed the partnership return, he failed to note that a Schedule K-1 had been filled out for EPD and that it reflected a 60-percent ownership in EPC. In addition, although Freasier's own Schedule K-1 shows a 34.001-percent ownership interest in EPC as of the end 1984, it reflects only a 15-percent distributive share of EPC's charitable contribution. Freasier testified that although he had reviewed the partnership return before he signed it, he had not reviewed the Schedules K-1 attached thereto. We find it difficult to believe that a tax attorney with Freasier's qualifications either would have failed to review the Schedules K-1 or would have missed these inconsistencies upon executing the partnership return. These circumstances further undermine Freasier's testimony regarding EPD's liquidation. We note that "Positive and uncontradicted testimony of a particular fact will ordinarily be accepted, but testimony which is inherently questionable, improbable, or unreasonable may be rejected even though no contradictory testimony *136 is offered." Schad v. Commissioner, 87 T.C. 609, 620 (1986). Respondent asserts that the manner in which the documents relating to the conveyance of the mainland property and the Goodwin Islands by EPC were executed indicates that EPD had not been liquidated by December 21, 1984, the date of the charitable contribution. The deeds and Certificate of Satisfaction were signed as follows: ENVIRONMENTAL PRESERVATION COMPANY by ENVIRONMENTAL PRESERVATION DEVELOPERS, INC. By /s/ B. R. Freasier, Jr. (Seal) President
Attest: /s/ Gary S. Cook Secretary However, at a time when it was indisputably EPC's general partner, EPD had executed deeds of trust on behalf of EPC in the same manner as shown above, except by different officers. Respondent argues that the manner in which the deeds conveying the Goodwin Islands and mainland property were executed is consistent with the manner in which EPD had executed other documents on behalf of EPC, and does not establish that EPD was executing the deeds in any capacity other than as general partner. Thus, reasons respondent, EPD had not been liquidated prior to the transfer of the property. EPC, on the *137 other hand, maintains that the deeds transferring its interest in the mainland property and Goodwin Islands were executed by EPD as agent for it. We do not agree. Freasier testified that EPC's real estate counsel, Robert F. Ripley, Jr., had suggested that "the corporation should do it rather than trying to go around and get a lot of signatures with respect to it". Supposedly this manner of executing the documents was authorized at EPD's corporate meeting. The minutes of that meeting were not introduced into evidence, nor did Robert F. Ripley, Jr., testify. We find it difficult to believe that there is no document in existence which authorizes EPD to execute the deeds as the agent of EPC, since such authorization would in general be a matter of concern to any transferee of property, if EPD was acting as EPC's agent. We note finally that EPC has failed to show that EPD had indeed distributed its partnership interest in EPC to its shareholders. For Federal tax purposes, a distribution of property on the basis of stock ownership occurs where the shareholder has a right of action against the corporation for the property, or where the property is "within the absolute and unqualified *138 dominion and control of the stockholder". Hadley v. Commissioner, 36 F.2d 543, 544 (D.C. Cir. 1929), affg. 6 B.T.A. 1031 (1927); Chattanooga Sav. Bank v. Brewer, 17 F.2d 79 (6th Cir. 1927). In general terms, income from stock arises only where something has been "received or drawn" by the shareholder "for his separate use, benefit and disposal". Eisner v. Macomber, 252 U.S. 189, 207 (1920). With respect to this matter, respondent asserts that EPD did not follow the provisions of EPC's partnership agreement in transferring either its general partnership interest or its limited partnership interest in EPC to its stockholders. EPC, on the other hand, maintains that an interest in the partnership, whether general or limited, may be assigned without requiring the consent of the other partners or the execution of an amendment to the Certificate of Limited Partnership. Although EPC's interpretation is consistent with the partnership agreement, we note that, if EPD had transferred title pursuant to the provisions of the partnership agreement, this would have provided corroboration of an actual distribution. *139 The only evidence we have that a distribution had taken place is Freasier's testimony of the putative meeting of EPD's stockholders, the minutes of which were not produced. Furthermore, Freasier's testimony that the unanimous consent of the partners had been obtained regarding the transference of the EPD's general partnership interest in EPC begs the question why the additional step of amending the Certificate of Limited Partnership had not been taken. In these circumstances, we are not persuaded that the interests in the partnership had been distributed to EPD's shareholders, assuming that the liquidation of EPC had been intended. We are left with the distinct impression, based upon the nature of Freasier's testimony and the lack of its corroboration, that EPD neither distributed its interest in EPC to its shareholders nor liquidated on or prior to December 21, 1984. Respondent's determination as to EPC's partners and their respective interests on the date of EPC's gift to the Endowment Association is sustained. Based on the foregoing, Decision will be entered for respondent. Footnotes
*. Following a hearing, this Court, on January 14, 1991, allowed Alvin Q. Jarrett (Jarrett), a party to this action under sec. 6226(d), to file his election to participate out of time pursuant to Rule 245(c). Jarrett passed away on March 27, 1991. By Order dated April 8, 1991, the Estate of Alvin Q. Jarrett, successor to Jarrett, was permitted to participate in this case. All statutory references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
1. The Plan qualifies its findings by stating that "Site-specific information concerning development suitability can only be obtained through detailed on-site investigations and testing."↩
2. The record is not clear as to the respective interests of each shareholder in EPD.↩
3. In general, the same methodology is used to determine fair market value for purposes of the estate and gift tax as is used to determine the amount of a charitable contribution deduction. Anselmo v. Commissioner, 80 T.C. 872, 881 (1983), affd. 757 F.2d 1208↩ (11th Cir. 1985).
4. Respondent's expert, relying on newspaper articles and the U.S. Geological Survey topographic map of the Puquoson West Quadrangle, 1983 survey, concluded that the main island covered 215 acres, that at most 114 acres lie above the high-water mark, and that only 4.5 acres lie above 5 feet in elevation and .25 acres above 10 feet. EPC's expert, Ripley, contends that the main island has 307 acres of land not covered by wetlands, based upon the Puquoson Tidal Marsh Inventory. The latter report, relying on aerial photographs and topographic maps, determined that 293 acres of the Islands were covered by marshes. Ripley concluded that, since only the main island had any nonmarsh areas, it covered at least 307 acres. Ripley determined that 55 percent of the land on the main island was usable, based upon personal observation and discussion with others, and that the other 45 percent of the island consisted of areas of marsh, low land, and pocket water.↩
5. Ripley testified that a "deep water terminal is a facility that can be used by ships drawing 30 or 35 feet or more, and will -- and can come in and dock, offload and onload, which ever is necessary, and have a good harbor on which to anchor, if necessary."↩
6. Wetlands include both vegetated and nonvegetated wetlands. Vegetated wetlands means all that land lying between and contiguous to mean low water and an elevation above mean low water equal to the factor 1.5 times the mean tide range at the site of the proposed project in the county, city or town in question; and upon which is growing on July 1, 1972 or grows thereon subsequent thereto, any one or more of * * * [37 kinds of plants]. [Va. Code Ann. sec. 62.1-13.2↩(f) (Michie 1987).]
EPC's expert stated that the mean tide range at the Goodwin Islands was 2.6 feet. Thus, vegetated wetlands extend to an elevation of 3.9 feet, and given the small amount of land lying above 5 feet on the main island, the amount of land not subject to the Wetlands Act appears significantly small.
7. Our holding raises the questions why GIDC would have recorded an excessive value for the Goodwin Islands for purposes of recording the transfer, and why EPC was willing to pay more in property taxes as a result of excessive assessments by the county. Although we are mindful of such concerns, we are not persuaded by the record that the property could have been worth either the amount recorded as constituting the value of the transfer in 1977, or the amount at which it was assessed during the years prior to the charitable contribution.↩
8. Robert F. Ripley, Jr., is the son of EPC's expert witness, and was EPC's real estate counsel. ↩
9. Freasier testified that the minutes of the meeting authorizing liquidation were taken, but that they had been lost. However, his testimony was not corroborated.↩