T.C. Memo. 2000-94


UNITED STATES TAX COURT


KATHERINE STRASBURG, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1953-98.                    Filed March 20, 2000.


<u>Harry J. Kaplan</u>, for petitioner.

<u>Marion T. Robus</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes of $427,680 for 1993 and $114,840 for 1994 and accuracy-related penalties under

section 6662(h)[1] for gross valuation misstatement of income of $171,072 for 1993 and $45,936 for 1994.

After concessions,[2] the issues for decision are: (1) Whether $1,080,000 was the fair market value of a conservation easement (the MLR easement) granted by petitioner to the Montana Land Reliance (MLR) in 1993. We hold it was $800,000. (2) Whether $290,000 was the fair market value of an amendment to the MLR easement granted by petitioner in 1994. We hold it was. (3) Whether petitioner is liable for an accuracy-related penalty under section 6662(h) in 1993 or 1994. We hold she is not.

### FINDINGS OF FACT

The parties submitted this case partially stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition herein was filed, petitioner resided in Atherton, California.

From September 15, 1992, until the present, petitioner has been the fee-simple owner of an approximately 320-acre tract of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent originally determined that the value of the conservation easement granted by petitioner to the Montana Land Reliance in 1993 was zero, and that the value of a modification of this easement in 1994 was zero. However, respondent now concedes that the value of the conservation easement in 1993 was $275,000.

real property located in the upper Boulder River Valley in Sweet Grass County, Montana.

By deed dated September 9, 1993, petitioner conveyed to MLR an open-space easement in gross over the real property, including in perpetuity the right to restrict subdivision of the real property. Section V of the MLR easement specifically provided, in relevant part, that the following uses of the property were inconsistent with the easement:

> A. <u>Subdivision</u>. The division, subdivision or de facto subdivision of the Premises, except as provided in Section III, paragraph H.[3]
>
> *    *    *    *    *    *    *
>
> C. <u>Commercial facilities</u>. The establishment of any commercial or industrial facilities * * * including, but not limited to, guest ranching, * * * campground, trailer park * * *
>
> *    *    *    *    *    *    *
>
> F. <u>Construction</u>. The construction of any structures except as otherwise provided in Section III, paragraphs D or E.[4]
>
> G. <u>Roads</u>. The construction of roads except in connection with ranching and other agricultural uses; fishing and other recreational uses; and, residential access. Any road constructed for one or more of such purposes shall be sited and maintained so as to

---

[3]Sec. III, par. H of the easement allows petitioner to divide the real property into two parcels.

[4]Sec. III, pars. D and E allows petitioner to maintain and repair the existing structures and to construct two additional single-family residences, respectively. In 1994, petitioner modified the MLR easement to allow the additional construction of only one single-family residence.

minimize adverse impact on the significant ecological and aesthetic values of the Premises.  Any road construction shall be subject to the prior written approval of Grantee.

       *      *      *      *      *      *      *

H.  <u>Commercial feed lot</u>.  The establishment or maintenance of any commercial feed lot, defined for purposes of this Easement as a facility used for the purpose of receiving, confining and feeding of livestock for hire.

       *      *      *      *      *      *      *

M.  <u>Game or fish farms, or kennels</u>.  The raising or confinement of wild game, native or exotic fish, other exotic animals, or dogs for commercial purposes. The owner(s) or caretaker may, however, have and raise dogs or game birds for their own personal use and enjoyment.

N.  <u>Hunting and commercial fishing</u>.  Hunting of any kind, or commercial fishing except as provided in Section III, paragraph B.[5]

       *      *      *      *      *      *      *

O.  <u>Commercial timber harvest</u>.  Commercial timber harvest of any kind.

By amendment to deed dated November 17, 1994, petitioner relinquished the right to build one of the two additional single-family residences specifically reserved in the MLR easement on the real property, thereby making a further gift to MLR.

---

[5]According to sec. III, par. B of the easement, petitioner does have the right to use the real property for fishing as to herself, her family, employees, and invitees in accordance with State and Federal regulations, so long as the levels of intensity are "not detrimental to the quality of fishing."

The easement gifts in 1993 and 1994 were legally valid in accordance with the terms thereof and are binding on petitioner and "all future owners and tenants". Petitioner did not receive consideration from MLR for the easement gifts.

During all relevant periods, MLR was an organization described in section 501(c)(3), and donations of qualified conservation easements to it are deductible under section 170(h). The MLR easement executed by petitioner on September 9, 1993, and recorded on September 13, 1993, is a "qualified conservation contribution" under section 170(f)(3)(B)(iii) and (h). In addition, the amendment executed in favor of MLR by petitioner on November 17, 1994, and recorded on November 29, 1994, is a "qualified conservation contribution" under section 170(f)(3)(B)(iii) and (h).

Petitioner's property is a spectacular piece of property surrounded by the Gallatin National Forest on three sides. Properties surrounded by nondeeded National Parks are known as inholdings. Petitioner's property is properly classified as an inholding.

Petitioner's property is approximately 320 acres in size and is situated on the floor of the Boulder River Valley. It is irregular in shape and ranges from gently to moderately sloping native rangeland and timber-covered land. The Boulder River, a

well-known fishing stream, runs through the property; a bridge provides full access to both sides of the property.

The valley where the property is located is narrow and surrounded by subalpine mountain peaks that are 7,000 to 10,000 feet above sea level.  The property directly adjoins the Natural Bridge State Monument.  The Natural Bridge State Monument has a unique rock bridge over the Boulder River, as well as a falls area, and is a popular natural attraction.  The areas to the south of the property are mostly rugged forest, and there are only a few deeded parcels within the forest.

Petitioner's property is adjoined by a Forest Service public road, so the property has direct access to public roads. Utilities are installed along the roadway and into the property. State Highway 298, the road that provides access to the Gallatin National Forest, runs through the northwest corner of the property and provides good access for the property.  There is further access around the property by wheel and track roads.  The property is physically suitable for subdivision.

Petitioner's property has some buildings, including the owner's house, a caretaker's house, a guest cabin, and a bunkhouse.  The owner's and caretaker's houses are complete residences; the guest cabin has no kitchen, and the bunkhouse has no plumbing.

The property is subject to no zoning restrictions but is governed by the Sweet Grass County Master Plan of the Upper Boulder River Planning Area Growth Policy (Growth Policy).  The Growth Policy discourages subdivisions of six or more lots.[6] Under Montana law, petitioner's property could be divided into two 160-acre parcels without prior county approval.  Then, pursuant to the Growth Policy, the two 160-acre parcels may be divisible into 5 parcels, respectively, for a total of 10 parcels.  Although petitioner's property may be divisible in this manner, the development potential of petitioner's property was not known at the time it became encumbered with the MLR easement. The development potential would not be known unless and until petitioner presented a request for a proposed subdivision to Sweet Grass County for approval.  In the absence of such approval, petitioner's property could be divided into five parcels of 40 acres or more without violating any of the published policies of the Growth Policy.[7]

_____

[6]In this regard, the Growth Policy states:

> 2.  Major subdivisions (six or more lots). Subdivisions may impair the local canyon character and influence general social change.  The board feels that the desires of area residents are to maintain the local character, generally excluding major subdivisions.

[7]The Growth Policy describes three general land use categories:  Suburban residential, rural residential, and open and resource land.  Suburban residential has a maximum density of one dwelling per acre.  Rural residential property has a maximum

(continued...)

OPINION

Issue 1.  Whether $1,080,000 Was the Fair Market Value of the Easement in 1993

The principal issue for decision is the value of the MLR easement.  The easement satisfies the requirements of a "qualified conservation contribution" provided by section 170(h).  On her 1993 tax return, petitioner claimed the fair market value of the MLR easement was $1,080,000.

A.  Relevant Legal Considerations

Section 1.170A-1(c)(1), Income Tax Regs., provides, in relevant part, that "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution".  Fair market value "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.  The question of value is a question of fact, necessarily arrived at after considering all the relevant factors.  See Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.

---

[7](...continued)
density of one dwelling per 5 acres.  However, open and resource land has a maximum density of one dwelling per 40 acres.

The fair market value of the MLR easement should be based on the highest and best use of petitioner's property at the valuation date, including potential development.  See, e.g., Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986); Hilborn v. Commissioner, 85 T.C. 677, 688 (1985); sec. 1.170A-14(h)(3)(i) and (ii), Income Tax Regs.  The realistic and objective potential uses for petitioner's property control.  See Stanley Works v. Commissioner, supra.  Regardless of whether an owner actually puts the property to its highest and best use, we consider "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future".  Olson v. United States, 292 U.S. 246, 255 (1934).  Petitioner has the burden of proving the fair market value of the MLR easement.  See Rule 142(a).

The highest and best use of petitioner's property before the MLR easement was as rural recreational development (RRD) property.  RRD is a general property classification consisting of properties with multiple uses, including recreational use.  In addition, RRD property can be divided into smaller recreational parcels.  RRD property does not have development as its exclusive highest and best use, and the value of RRD property is not predicated on its development potential.  Property that is valued based upon its development potential is generally classified as

subdivision property.  Neither of the experts in this case assumed petitioner's property is subdivision property.

A conservation easement frequently is granted by deed of gift; consequently, there is rarely an established market from which to derive fair market value.  See Symington v. Commissioner, 87 T.C. 892, 895 (1986).  If no comparable sales of easements are available to determine the value, the easement is generally valued by a "before and after" analysis, comparing the fair market value of the property before the granting of the easement with the fair market value of the property after the granting of the easement.  Browning v. Commissioner, 109 T.C. 303, 315 (1997); Stanley Works v. Commissioner, supra at 399; Hilborn v. Commissioner, supra at 688; sec. 1.170A-14(h)(3)(i), Income Tax Regs.  The reduction in the property's value by reason of the encumbrance is the fair market value of the easement.

There is no mechanical application of the before and after methodology when other reliable indicators of market value are available.  In explaining the legislation that permitted the deduction for qualified conservation contributions, the Senate Finance Committee remarked about easement appraisal methodology as follows:

> conservation easements are typically (but not necessarily) valued indirectly as the difference between the fair market value of the property involved before and after the grant of the easement.  (See Rev. Rul. 73-339, 1973-2 C.B. 68 and Rev. Rul. 76-376, 1976-2 C.B. 53.)  Where this test is used, however, the

> committee believes it should not be applied
> mechanically. [S Rept. 96-1007, at 15-16 (1980), 1980-2
> C.B. 599, 606.]

The regulations also provide that the before and after method is used as a "general rule (but not necessarily in all cases)." Sec. 1.170A-14(h)(3)(i), Income Tax Regs.

B.  "Before and After" Analysis

The parties have stipulated that the fair market value of petitioner's property before the grant of the easement was $2,624,000.  The parties disagree as to the fair market value of petitioner's property after the grant of the MLR easement.  This disagreement accounts for the extreme variance in fair market value assigned to the easement by the parties.

To establish the fair market value of the MLR easement, each party offered the report and testimony of an expert witness. Both expert witnesses testified that they used a "before and after" method to value the MLR easement.  The experts' opinions involved an analysis of conservation easement sales, easement-encumbered property sales, and paired sales.[8]  Expert witnesses'

---

[8]The analysis of conservation easement sales involved comparing the purchase price of a conservation easement to the fair market value of the property that is burdened by the same conservation easement.  The purchase price of the conservation easement was divided by the fair market value of the burdened property to derive a diminution percentage attributable to the conservation easement involved in the comparison.

The analysis of easement-encumbered property sales involved a comparison of the fair market value of easement-encumbered

(continued...)

opinions are used to aid the Court in understanding an area requiring specialized training, knowledge, or judgment.  As the trier of fact, we are not bound, however, by the experts' opinions.  See <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; <u>Chiu v. Commissioner</u>, 84 T.C. 722, 734 (1985).  One expert may be persuasive on one particular element of valuation while another expert may provide more incisive help on some other element of valuation.  See <u>Parker v. Commissioner</u>, 86 T.C. 547, 561-562 (1986).  Consequently, using our best judgment, we may adopt some portions and reject other portions of expert testimony.  See <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282 (1938).

1.  <u>Petitioner's Expert Witness</u>

a.  <u>Qualifications</u>

Petitioner's expert, N. Clark Wheeler (Wheeler), has been actively engaged in the appraisal field for 20 years.  Wheeler is

---

[8](...continued)
property with the fair market value of the same property as if it was unencumbered by a conservation easement.  The fair market value of the property in its encumbered state was divided by the estimated fair market value of the property in its unencumbered state to derive a diminution percentage attributable to the conservation easement involved in the comparison.

The analysis of paired sales involved a comparison of the fair market value of easement-encumbered property with the fair market value of unencumbered property in the same general area. The fair market value of the encumbered property was divided by the fair market value of the unencumbered property to derive a diminution percentage attributable to the conservation easement involved in the comparison.

one of 19 accredited rural appraisers (ARA's) in the State of Montana.  The ARA designation is the highest professional designation offered by the American Society of Farm Managers and Rural Appraisers.  Wheeler's area of expertise is the appraisal of conservation easements throughout the western United States.

b.  Wheeler's Methodology and Conclusion

Wheeler used the "before and after" method to determine the fair market value of the MLR easement in 1993.  Wheeler produced two reports containing purported comparable sales related to the fair market value of the MLR easement.  The first report, produced in 1993 (the 1993 report), was Wheeler's original analysis of the easement's fair market value.  The second report, produced in 1998 (the 1998 report), was referred to as a "consulting report prepared to serve as a supplement to my original appraisal."

The 1993 report provides Wheeler's conclusions as to the fair market value of the MLR easement.  In the report, before the MLR easement, Wheeler opined petitioner's property had a fair market value of $7,500 per acre or $2.4 million (i.e., 320 acres x $7,500).[9]  After the MLR easement, Wheeler concluded that

_____

[9]This per-acre "before" value is different from the value stipulated by the parties.  In his 1993 report, Wheeler used petitioner's 1992 cost basis as the "before" value of petitioner's property.  Later, Wheeler agreed with respondent that the proper fair market value of petitioner's property in 1993 before the grant of the MLR easement was $8,200 per acre or

(continued...)

petitioner's property had a fair market value of $4,125 per acre or $1,320,000 (i.e., 320 acres x $4,125). The difference in the before and after values of petitioner's property was attributed to the MLR easement, giving the easement a fair market value of $1,080,000. Therefore, Wheeler's 1993 report assigned a per-acre value of $3,375 (i.e., $1,080,000 ÷ 320 acres) to the MLR easement.

Wheeler stated in his 1993 report that petitioner's property had "excellent potential [for development] before easement and this use is now precluded beyond the development of three residential sites." It is noted that Wheeler made the following statement early in his 1993 report:

> In general, the value reflections suggested by sales sold under easement are related to the most basic restrictive elements of a Conservation Easement which deal primarily with limits on residential development on property subdivision. * * *

In Wheeler's 1998 report he determined that the highest and best use of petitioner's property was as RRD property. Wheeler also stated in his 1998 report that the "highest and best use of the property as an unrestricted unit would be its sale and division in various acreage parcels and as an unencumbered investment property." Since the value of RRD property is not predicated upon subdivision/development, Wheeler placed undue

---

[9](...continued)
$2,624,000.

emphasis on this factor in his estimation of the fair market value of the MLR easement.

Regardless of the value attributable to development rights associated with RRD property, Wheeler stated numerous times in his 1998 report that the analysis of the MLR easement's fair market value must focus on petitioner's bundle of rights. While a primary right that petitioner may have given up was development of her property, according to Wheeler, there were other factors in addition to development which lowered the fair market value of petitioner's property in the "after easement" analysis.

In estimating the fair market value of the conservation easement, the parties focused on sales from Wheeler's 1998 report. Wheeler disclosed in this report that he "has analyzed and is aware of several sales in Montana, Idaho and Wyoming which involved the sale of conservation easement encumbered properties which have not reflected discounts at the time of sale." He stated further that "These easement properties are located in high end development markets with very limited deeded land bases, and in these areas large parcels are rarely exposed to the market." At trial, Wheeler explained that "high end development" means "an area that had high demand for rural development or recreation use." In other words, Wheeler used that term in 1998 to describe properties which were "very popular" recreational homesites.

In Wheeler's 1998 report, he did not discuss why the market in Sweet Grass County, especially along the Boulder River, was not a "high-end development" market. In Wheeler's 1993 report, he stated that rural land located along the Boulder River in the area surrounding petitioner's property is "rarely exposed to the market." He went on to state that the area surrounding petitioner's property was "influenced by the recreational amenities of the Boulder and Yellowstone Rivers and the Absaroka and Beartooth Mountain ranges which are located directly south of the subject." Finally, Wheeler stated: "Small-scale subdivision has taken place along the Yellowstone and Boulder Rivers, and the area is attracting national attention due to land purchases by celebrities and investors who are buying smaller ranch retreats in the area."

Given the limited amount of river frontage property in Sweet Grass County and its apparent recreational attractiveness to investors, petitioner's property certainly can be said to be in a high-end development market as that term was used by Wheeler. Accordingly, Wheeler's omission of recent comparable sales from other high-end development markets is questionable.

Additionally, Wheeler stated in his 1998 report that if an "Appraiser was analyzing a conservation easement on a property in Jackson Hole [one of the high end development markets] * * * easement encumbered sales in the direct area would be

considered."  However, for his 1998 report, Wheeler generally analyzed the effects of conservation easements on property value "in a more outlying area" in relation to petitioner's property. Wheeler concluded that this was appropriate because petitioner's property was "located in a market where it must compete with properties not subject to conservation easement".  This does not appear to be a valid reason for not including comparable sales closer in proximity to petitioner's property in the 1998 report.

The 1998 report analyzed 66 sales, of which 35 represented the direct sale of conservation easements and 31 represented the sale of property encumbered by a conservation easement.  In his 1998 report, Wheeler concluded that 11 of the purchased conservation easements and five conservation-easement-encumbered properties were directly comparable to petitioner's property.

To determine whether a particular property was comparable to petitioner's property, one must focus on the highest and best use of petitioner's property (i.e., RRD), the property's high recreational amenities (i.e., forest inholding along a principal river), the market conditions surrounding petitioner's property (i.e., "high-end development market"), and the restrictions contained in the MLR easement.  Because Wheeler made many assumptions in his 1998 report that were contrary to these criteria, with two exceptions, the original 16 transactions that

were presented as most comparable by Wheeler do not appear to apply to this analysis.

From the limited information regarding the conservation easement sales in Wheeler's 1998 report, it is difficult to surmise that any of these conservation easement transactions were comparable to the MLR easement. The limited information regarding the conservation easement sales also makes it difficult to determine whether any of the underlying properties involved in these sales were comparable to petitioner's property. Because of the limited information in Wheeler's report, we place no reliance on the conservation easement sales transactions.

Wheeler included 31 sales of easement-encumbered property in his 1998 report. The diminution percentages attributable to the conservation easements involved in the 31 sales were derived by an analysis of either easement-encumbered property sales or paired sales. Four of the thirty-one properties in this analysis appear to be comparable to petitioner's property. These properties are numbered 38, 58, 61, and 63 in Wheeler's report.[10] Each of the properties appears to have excellent potential as a recreational homesite, high recreational amenities, and conservation easements that are similar to the MLR easement. In addition, the properties were located in markets with a high

_____

[10]Properties 58, 61, and 63 are numbered 59, 62, and 64 in the addendum to Wheeler's report.

demand for such properties during 1993. Therefore, we adopt Wheeler's analysis of these properties as evidencing the fair market value of the MLR easement.

### 2. Respondent's Expert

#### a. Qualifications

Respondent's expert, Dennis C. Hoeger (Hoeger), is one of the 19 ARA's in the State of Montana and a member of the Montana Chapter of the American Society of Farm Managers and Rural Appraisers. He is also a member of the Appraisal Institute and a certified general appraiser in the States of Montana, Wyoming, and Idaho.

#### b. Hoeger's Methodology and Conclusion

Hoeger used the "before and after" method to determine the fair market value of the MLR easement in 1993. In agreement with the stipulations made by the parties, Hoeger opined in his report that petitioner's property had a fair market value of $8,200 per acre or $2,624,000 before the MLR easement. After the easement, he opined that petitioner's property had a value of $7,380 per acre or $2,361,600. Therefore, Hoeger concluded that the MLR easement had an estimated fair market value of $275,000 in 1993. To support his conclusion that the per-acre cost of petitioner's property decreased 10 percent after the MLR easement, Hoeger analyzed two easement-encumbered property sales and several paired sales.

Hoeger's assumptions related to his computation of the 10-percent diminution percentage incorporated many of the factors that are relevant to the determination of the fair market value of the MLR easement. While taking into account the restrictions in the MLR easement, Hoeger focused his analysis on comparing petitioner's property to other high recreational amenity properties in "high end development" markets. However, Hoeger assumed that the highest and best use of petitioner's property was as a recreational homesite before and after the imposition of the MLR easement, giving no consideration to any potential lost development in petitioner's property attributable to the MLR easement.

Although Hoeger's assumptions were in part correct, most of his comparable sales were questionable. Hoeger's analysis was divided into the following parts: Sales 5 and 6, sale 7, sale 8, sales 9 through 11, sales 12 and 13, and sales 14 and 15. Sales 5 and 6, sales 9 through 11, and sales 12 and 13 suffered from unverifiable assumptions related to the determination of the diminution percentage attributable to the conservation easements involved in those sales. The analysis of sale 7 contained misinformation regarding critical facts surrounding the sale. Sales 14 and 15 were questionable because the conservation easement involved in sale 14 was dissimilar to the MLR easement. Accordingly, only one sale (sale 8) does not suffer from some

defect.  We find that Hoeger's sale 8 is relevant to this analysis.

Sale 8

Sale 8 represented the December 1994 sale for $695,000 of approximately 157 acres located on the west side of Glacier National Park on the North Fork of the Flathead River in Montana. Hoeger stated that an analysis of this sale by Warren Illi (Illi), a certified appraiser in Montana, "indicates that the sale price was not adversely affected by the conservation easement."  Illi testified at trial and was certified as an expert.  Illi has been an appraiser for more than 30 years and has been involved in the appraisal of "several hundred" conservation easements.  Copies of Illi's appraisal, containing data related to sale 8, were provided to the Court.

Illi used sale 8 to determine the diminution in value attributable to a conservation easement's being granted on a different 40-acre piece of property also located in the North Fork of the Flathead River in Montana.  In stating his rationale for including sale 8 in his analysis, Illi provided insight into this case.  Recognizing that sale 8 did not fit the historic trend of diminution of values in Montana, Illi nonetheless stated that the fact that Sale 8 showed no loss in value "is not surprising."  He went on to explain:

> The Forest Service's aggressive program to buy in fee
> or encumber all river front lands with conservation

easements, has severely restricted the supply of such lands.  Thus the remaining owners can ask almost whatever they want, with a likelihood of getting their asking price.  Even though a property cannot be subdivided, it can serve as a country estate for the well-to-do.  * * *  There is a portion of the buying public who will acquire easement encumbered property without a price discount even with restricted subdivision and development opportunity.  This is especially so if the property supply is greatly restricted.  Sale [8] indicates no value loss due to easement imposition.

Wheeler described the area surrounding the location of sale 8 (i.e., North Fork of the Flathead River) as a "high end development" market.  Additionally, Illi's appraisal described sale 8 as a "superb country estate for recreational use" where "all of the surrounding public land is undeveloped and will be managed for wildlife and primitive style recreation uses." Considering that the market in the North Fork area was similar to the market surrounding petitioner's property, and that sale 8's highest and best use was most likely as RRD property, sale 8 was a valid comparable sale.

Additionally, Illi's rationale supporting the value assigned to the easement in sale 8 seems to apply directly to petitioner's property.  The property is located in a market where the supply of Boulder River property is severely restricted.  Therefore, it is probable that a portion of the buying public will not pay less for petitioner's property even if it is encumbered by the MLR easement.

3.  <u>Final Determination of MLR Easement's Fair Market Value</u>

a.  <u>Diminution in Petitioner's Property's Market Value</u>

Recognizing that the MLR easement interferes not only with petitioner's right to subdivide her land but also with numerous other rights, this Court believes that it is appropriate to use the comparable sales from the experts' opinions to approximate the total loss in value of petitioner's property attributable to the MLR easement.

As discussed above, five sales from the experts' opinions are comparable to petitioner's property.  Four of these sales come from Wheeler's 1998 report, and one sale comes from Hoeger's report.  These comparable sales demonstrate that diminution percentages of 50, 35, 40,[11] 35, and 0 are associated with the grant of a conservation easement.  Accordingly, this Court holds that the diminution in petitioner's property in the after-easement analysis was 32 percent, the average of these five comparable sales.

b.  <u>Section 170 Limitation on Petitioner's Deduction</u>

Applying the 32-percent diminution rate to the stipulated "before" fair market value of petitioner's property results in

---

[11]A table in Wheeler's 1998 report describes sale 61 as having a 45-percent diminution; however, in his 1993 report, Wheeler states that the same sale has a 40-percent diminution. On the basis of a review of Wheeler's analysis of sale 61 in his 1993 and 1998 reports, we find that sale 61 has a 40-percent diminution.

the MLR easement's having a fair market value of $839,680 in 1993 (i.e., $2,624,000 fair market value before the easement x 32 percent). However, because the "before" fair market value of petitioner's property is not the same as petitioner's cost basis in the property, the charitable contribution deduction related to the MLR easement is limited by section 170(e)(1)(A).

Section 170(e)(1)(A) limits the amount that may be deducted as a charitable contribution under section 170(a). It provides that charitable contributions must be reduced by the amount of gain that would not have qualified as long-term capital gain if the donated property had been sold at its fair market value on the date of the donation. See sec. 170(e)(1)(A).

The allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated. See Lary v. United States, 787 F.2d 1538, 1540 (11th Cir. 1986); Glen v. Commissioner, 79 T.C. 208, 212 (1982); Morrison v. Commissioner, 71 T.C. 683, 688 (1979), affd. per curiam 611 F.2d 98 (5th Cir. 1980). Because the MLR easement does not satisfy the long-term capital gain holding period, i.e., petitioner donated the easement on September 9, 1993, less than 1 year after she purchased the property on September 15, 1992, the MLR easement is treated as ordinary income property. See secs. 170(e)(1)(A), 1222(3) and (4). Therefore, the amount of

petitioner's charitable contribution deduction is limited by her adjusted basis in the MLR easement.

The computation of petitioner's basis in the MLR easement is equal to that portion of the adjusted basis of the entire property that bears the same ratio to the adjusted basis of the entire property as the fair market value of the donated property bears to the fair market value of the entire property.  See sec. 170(e)(2); sec. 1.170A-4(c)(1)(i), Income Tax Regs.  Therefore, under section 170(e) and the regulations thereunder, petitioner's allowable charitable contribution deduction for 1993 is $800,000 (i.e., $2.5 million (petitioner's 1993 adjusted basis in her property) x 32 percent)).  See Griffin v. Commissioner, T.C. Memo. 1989-130, affd. 911 F.2d 1124 (5th Cir. 1990).

Issue 2.  Whether $290,000 Was the Fair Market Value of the 1994 Amendment to the MLR Easement.

In November 1994, an amendment to the MLR easement was recorded.  The amendment further restricted the property by allowing only one additional residence rather than two as contemplated in the MLR easement.  Wheeler assigned a value of $290,000 to the amendment.  Hoeger concluded the amendment had a value of zero.

Wheeler based his conclusion on an analysis of the value of several comparable properties.  Hoeger's analysis of the 1994 amendment included one paragraph in his report that stated the following:

In November, 1994 an Amendment to the Conservation Easement was recorded. This amendment further restricted the property by allowing only one additional residence rather than two. This restriction to one additional residence is not considered a significant restriction based on a review of the easements used in this report and the market for properties in the area.

We disagree. It seems self-evident that such a restriction on such a large property is significant. Hoeger did not include any further analysis of the 1994 amendment in his report. Accordingly, we adopt Wheeler's analysis of the 1994 amendment and hold that the fair market value of the amendment to the MLR easement was $290,000.

Issue 3. Whether Petitioner Is Liable for an Accuracy-Related Penalty Under Section 6662(h) in 1993 or 1994

In the notice of deficiency, respondent determined that petitioner was liable for accuracy-related penalties under section 6662(h) for 1993 and 1994. Section 6662(h) applies to a gross valuation misstatement where the value of property claimed on a tax return is 400 percent or more of the value determined to be correct. See sec. 6662(h)(2)(A), (e)(1). However, the penalty is imposed only when the portion of the underpayment for the taxable year attributable to the valuation misstatement exceeds $5,000. See sec. 6662(e)(2).

In this case, the value of the MLR easement claimed on petitioner's 1993 tax return, $1,080,000, is not 400 percent, nor even 200 percent, or more of the value determined to be correct, $800,000. In addition, we have accepted the value of the 1994

amendment claimed on petitioner's tax return.  Therefore, neither section 6662(h) nor (e) applies to petitioner in 1993 or 1994.

<u>Decision will be entered</u>

<u>under Rule 155</u>.