**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–119L.

United States Court of Federal Claims.

Aug. 15, 2002.

Edward J. Maginnis, Washington, D.C., for plaintiffs, with whom was Cheryl C. Burke and Carol B. O'Keefe.

Alan Brenner, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom was Assistant Attorney General Thomas L. Sansonetti.

## OPINION

ALLEGRA, Judge.

This inverse condemnation case is before the court following trial in Washington, D.C. Plaintiff seeks just compensation under the Fifth Amendment for the physical taking of a portion of the land that underlain a former trolley line running from the border of the District of Columbia to the Cabin John Bridge in Maryland (the "Cabin John" property). The parties have agreed that some physical taking of the Cabin John occurred when an easement granted in 1964 to the United States to construct the Clara Barton Parkway (the Parkway) over a portion of the trolley line was revoked in 1995. Trial focused on two issues: First, whether plaintiff or the United States owns a particular segment of the Cabin John, denominated Parcel D—resolution of this issue is potentially important because it affects whether the Cabin John, aside from the encroachment of the Parkway, is contiguous. The second issue involves the damages owed plaintiff, with the parties grossly differing in their estimates of the loss occasioned by the taking.

## I. BACKGROUND FINDINGS

In 1895, pursuant to a Congressional charter, the Washington and Great Falls Electric Railway Company built a trolley line over the Cabin John which ran from Georgetown in the District of Columbia to Glen Echo, in

Montgomery County, Maryland. One author, in excerpts in the record, described this Glen Echo Trolley Line in the following terms:

> This line, which later became the best known suburban line in Washington, was, by virtue of its location, one of the more scenic trolley rides in the country. After leaving 38th and Prospect [in Georgetown] and passing over the first trestle, the road entered [a] private right-of-way high on a bluff overlooking the Potomac River. There were a number of high trestles, very few road crossings, and lots of heavily wooded countryside interrupted by delightful and impressive views of the Potomac River Valley. At Glen Echo, there was a Chatauqua—an institution as close to the trolley as the amusement park of a few years later. At Cabin John [further up in Glen Echo] there was an amusement park, while between Georgetown and the District Line there was the International Athletic Club which featured a bicycle racetrack.

Leroy O. King, *100 Years of Capital Traction: The Story of Streetcars in the Nation's Capital* 47 (1972). Eventually, D.C. Transit System, Inc. ("D.C.Transit") took title to the Cabin John; in approximately 1960, the trolley ceased operations. Thereafter, in 1964, D.C. Transit granted the National Park Service (NPS) a license to construct the Clara Barton Parkway over two segments of the Cabin John.

In 1972, the Washington Metropolitan Area Transit Authority (WMATA or plaintiff), pursuant to a Congressional directive, acquired the bus service assets of D.C. Transit and other bus companies, and became primarily responsible for providing bus transportation services in the Washington, D.C. metropolitan area. *See* National Capi-tal Area Transit Act of 1972, Pub.L. No. 92–517, 86 Stat. 999 (1972). A short time later, WMATA would also become responsible for building and operating the METRO, the capital region's subway system.

On February 26, 1990, the United States Court of Appeals for the District of Columbia entered an order creating the Washington Metropolitan Area Riders' Fund (the "Riders' Fund") for the purpose of receiving the proceeds of a $9.2 million settlement resolving two cases that challenged the validity of fare increases collected by D.C. Transit in the 1960's. *See generally Democratic Cent. Comm. of the District of Columbia v. The Washington Metropolitan Transit Comm'n*, 84 F.3d 451 (D.C.Cir.1996) (discussing the history of this prior litigation). The settlement proceeds deposited in the Riders' Fund by D.C. Transit were represented by collateralized promissory notes. On July 14, 1992, D.C. Transit defaulted on its obligation to pay the settlement amount, and the Riders' Fund thereafter foreclosed on the note's collateral, which included the Cabin John. The Riders' Fund bought the Cabin John at a public foreclosure sale held on June 16, 1993.[1] By order dated December 23, 1994, the United States Court of Appeals for the District of Columbia approved the creation of The Riders' Fund Trust, (the "Trust"), which retroactively took over the function of the Riders' Fund. *Democratic Cent. Comm. of the District of Columbia v. The Washington Metropolitan Area Transit Comm'n*, 41 F.3d 757 (D.C.Cir.1994). On October 30, 1995, the Trust, through counsel, revoked the 1964 license.

Pursuant to an Order of Conveyance of the D.C. Court of Appeals dated April 9, 1997, the Cabin John was transferred by the Trust to WMATA. WMATA has been directed by the D.C. Court of Appeals to use any pro-

---

1. The Substitute Trustee's Deed of Conveyance, dated October 24, 1995, is recorded in Liber 13712, folio 389, among the Land Records of Montgomery County, Maryland, and purports to convey—

   approximately 668,583 square feet or 15.35 acres of land, more or less, being a strip varying in width from 30 fee [sic] to 120 feet and having a length of 3.21 miles beginning West of the Dalecarlia Reservoir and extending to Cabin John Creek, running generally South of and roughly parallel with MacArthur Boulevard (formerly Conduit Road) consisting of fee simple parcels and rights-of-way parcels, being formerly the Maryland portion of the Georgetown/Glen Echo/Cabin John Street Care right-of-way being the lands of the D.C. Transit System, Inc., a District of Columbia corporation; in its own right and as successor, by merger of Cabin John Realty, Inc., a District of Columbia corporation.

ceeds from the sale of the Cabin John for the restricted purpose of purchasing buses for use in the District of Columbia. Such apparently is the fate of any damages awarded herein.

The instant case was filed on February 29, 1996, and later reassigned to the undersigned judge. Trial was held in this matter on December 10–12, 2001, and post-trial briefing was completed on April 11, 2002. For purposes of trial, the parties stipulated that a taking occurred on October 30, 1995, the date the 1964 license was revoked, but they differed, by orders of magnitude, in their estimate of the damages—for plaintiff, $2,840,000; for defendant, $22,000. As will be described in greater detail below, the parties' sharp disagreement about the proper measure of damages centers on three factors: First, as noted above, the parties dispute who owns a portion of the Cabin John referred to as Parcel D and, at trial, produced conflicting factual and expert testimony on this point. Second, the parties disagree as to the extent of the encroachment of the Parkway on the Cabin John. Finally, the parties are at loggerheads as to the propriety of the valuation methods and corresponding assumptions adopted by their respective appraisal experts—differences that led to the wildly disparate results cited above. The court will render more exegetic findings regarding these issues in the pages that follow.

## II. DISCUSSION

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. In determining the amount of just compensation owed here, the court must first resolve who owns Parcel D and then consider the other evidence impacting the extent of the taking and the damages associated therewith.

### A. Ownership of Parcel D

■ Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to "existing rules or un- derstandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Phillips v. Washington Legal Found.,* 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).[2] Under Maryland law, a plaintiff seeking to establish title to property must establish both possession and legal title by "clear proof." *See Stewart v. May,* 111 Md. 162, 173, 73 A. 460 (1909); *see also Polk v. Pendleton,* 31 Md. 118, 124 (1869). This "clear proof" standard does not entail proof by "clear and convincing" evidence. Rather, the Maryland courts have "consistently applied the preponderance of the evidence standard in cases involving private property ownership." *Urban Site Venture II Ltd. Partnership v. Levering Assocs. Ltd. Partnership,* 340 Md. 223, 229, 665 A.2d 1062, 1065 (1995); *see also, e.g., Dreisonstok v. Dworman Bldg. Corp.,* 264 Md. 50, 58, 284 A.2d 400 (1971). In further explaining this standard, it has been noted that " 'the complainant's right to relief depends upon the strength of his own title, not upon the weakness of the title of his opponent,' " and, more colloquially, that "a plaintiff has no interest in land if he himself does not own it." *Porter v. Schaffer,* 126 Md.App. 237, 262, 728 A.2d 755 (1999) (quoting 65 Am.Jur.2d, *Quieting Title* (1972 & Supp.1998)).

■ Neither WMATA nor the United States possesses a clear, unblemished chain of title establishing ownership of Parcel D— various deeds suggest ownership in one or the other party, but none apparently is conclusive. Instead, both parties rely on extrinsic evidence, as well as the opinions of their respective title experts, to support their title claims. *See Gilchrist v. Chester,* 307 Md. 422, 425, 514 A.2d 483 (1986) (stating that a court may look to extrinsic evidence, where deed is ambiguous).

Pasting together the record evidence, it appears that through late 1889 and early 1890, George S. Brown and several other stakeholders of the Chesapeake and Ohio Canal Company (the C & O) filed bills in the

---

2. For two recent cases' in this court applying this rule, *see Toews v. United States,* 53 Fed.Cl. 58 (2002) and *Amaliksen v. United States,* 53 Fed.Cl. 63 (2002).

Circuit Court for Washington County, Maryland, petitioning the Court to appoint receivers to take possession of the C & O's property in order to manage and operate it until the debts of the company were paid. For reasons unexplained, the court did not approve the petition until almost fifty years later, on April 29, 1938, when it issued a decree appointing Messrs. Young, Hartz and Nicolson receivers of all of the rights, title and interest of the C & O, The receivers, after being authorized to do so, commenced negotiation for the sale of this property to the United States. On August 6, 1938, the receivers entered into a contract of sale with the United States to sell certain portions of these properties, which contract provided, in pertinent part:

> Said receivers agree forthwith to recommend to said Courts that all of the property, estate, rights and franchises of the Chesapeake and Ohio Canal Company, now vested in them, excepting, however, the reserved portions hereinafter described be sold to the United States of America for the sum of Two Million Dollars ($2,000,000), and it is understood and agreed by both parties hereto that the real property referred to above includes all of those parcels or tracts of land in the States of Maryland, Virginia and West Virginia, as shown on the 15 "property maps of the Chesapeake and Ohio Canal Company as surveyed by B.F. Mackall under the direction of G.L. Nicolson, General Manager," and all of those parcels or tracts of land in the District of Columbia as shown on the 2 "plats of the Chesapeake and Ohio Canal Company property as surveyed by H.W. Brewer, February, 1894," to the extent that said property is now owned by the said Receivers, together with any and all other parcels or tracts of land, the title to which is now vested in the said Receivers.

Defendant contends that Parcel D was among the properties conveyed by this 1938 contract; plaintiff asserts that it was not, having been earlier purchased by the Wash-

ington and Great Falls Electric RR, a predecessor of WMATA, in 1895.

In support of its construction of the contract, defendant produced copies of a September 23, 1938, deed, recorded in Liber 638, Folio 76, of the Land Records of Montgomery County, Maryland, transferring property from the C & O to the United States. That deed states that the receivers, in consideration of the sum of two million dollars, conveyed to the United States "all the property, estate, rights and franchises of said Chesapeake and Ohio Canal Company." Plaintiff's title expert, however, pointed out that this deed was based on the August 6th contract of sale, which referenced "the 15 'property maps of the Chesapeake and Ohio Canal Company as surveyed by B.F. Mackall under the direction of G.L. Nicolson, General Manager.'" Unlike defendant's title expert, plaintiff's expert sought out the original linen versions of the Mackall plat maps and, when that search proved fruitless, pursued, discovered and ultimately reviewed two hand-made copies of these maps—one at the National Archives (the Archives) and the other at the NPS. At trial, plaintiff produced photocopies of the maps at the National Archives and photographs of the maps at the NPS. Plaintiff's title expert testified that the maps at the National Archives show that Parcel D was owned by the Washington and Great Falls Electric RR and thus was not among the C & O property conveyed in 1938. To buttress this assertion, he testified that the copies of the maps at the Archives and the NPS both highlighted the lands owned by the C & O—such lands were marked in red at the Archives and in brown pencil at the NPS—and that Parcel D was not so marked. Joseph Cook, the Chief of Land Resources for the National Capital Region for the NPS, pointed out that no one could verify exactly who made the pencil markings on the NPS maps. But, plaintiff's expert testified that the markings on both sets of the maps were identical and that, in his opinion, that meant that the C & O did not own Parcel D in 1938 and, therefore, could not have transferred it to the United States that.[3] Aside from the

---

**3.** In addition, in reviewing a segment of the NPS map, plaintiff's expert noted that a "Z" or "≈" marking, in which the top prong of the Z was above parcel D and the bottom prong was below that parcel, indicated that the C & O did not own

comments made by Mr. Cook, the testimony of plaintiff's expert on this point was essentially unrebutted because, as noted, defendant's title expert apparently did not bother to review the Mackall maps, even after receiving plaintiff's expert report and even though one set of the maps was held by the NPS.

In addition, both parties presented several other items of extrinsic evidence to support their respective claims. Defendant touted a Montgomery County Tax Map, dated June of 2001, which indisputably indicates that the United States owns Parcel D. It also produced a commitment to issue a title insurance policy, prepared by three reputable title insurance companies in June of 1961, which lists the United States as the proposed insured and includes a description of the property to be insured that both parties agree appears to include Parcel D. Finally, defendant introduced two plat maps suggesting that it owned a fee simple interest in the property: One was prepared in March of 1948 for the Capital Transit Co., another WMATA predecessor, and assertedly describes Parcel D as a "right of way" out of United States property; while the other, a March, 1961, plat, prepared for the National Capital Planning Commission depicts, by apparent reference to a legend, Parcel D as being "occupied" by WMATA's predecessor,

suggesting to defendant that WMATA owned something less than a fee simple interest therein. Relying on its expert and several deeds involving properties adjoining or close to Parcel D, defendant contends that any interests granted to the railway operator that were less than fee simple interests would likely have reverted to the respective grantors when the railway ceased to operate.

As pointed out by plaintiff's title expert, however, the tax map and 1961 plat produced by defendant, as well as the commitment to issue title insurance, all suffer from the same essential flaw—they are based on the same 1938 C & O deed whose interpretation is at issue and thus assume, without proving, the answer to the very question before the court. The other map relied upon by defendant, which was prepared for the Capital Transit Co., also proved, for the reasons stated in the margin, to be inconclusive.[4]

Plaintiff, moreover, produced its own competent evidence that more adequately supports its claim of ownership. For example, it highlighted the fact that Parcel D is well marked by U.S. Monuments and its expert testified, without contravention, that it is highly unlikely that a grant of anything less than fee simple interest to WMATA's predecessor would have been so extensively marked.[5] In addition, plaintiff's expert re-

---

4. Testimony revealed that the blown-up excerpt of this map submitted to the court was altered by

the property in the middle—Parcel D. Specifically, on this point, he testified:

> They show that it is not owned by the C & O Canal Company. And the thing that I'm looking at that leads me to that conclusion here is what the engineers refer to, and then people prepare plats as a Z or a double-Z. And that's that line with a hook on either end that begins at claim by C & O Canal Company, and then goes down toward the river. And the indication of—what that means is that there is a piece of land that is owned by an entity, but there is somebody else that owns a piece of land in between. So rather than just put the phrase claimed by C & O Canal twice, once at the bottom, once at the top, they put it once and use the double-Z to show that both pieces of land are owned by the same person.
> And that same double-Z, if you'll notice, appears going perpendicular, if you will, on either end of the parcel D, which again indicates that whoever owns parcel D owns the land on either side of parcel D.

defendant to include a color-code that was not on the original. While the court does not believe that this alteration was intended to mislead, it remains that, without this color-coding, the notion that Parcel D was an easement taken from C & O land is not apparent from this document. Moreover, a review of this map discloses that other parcels which WMATA's predecessors apparently owned—defendant has only properly contested the ownership of Parcel D—are, nonetheless, described as "right of ways," suggesting that the use of that language was not necessarily intended to denote an easement.

5. The monuments are clearly marked on a 1941 map prepared for the National Capital Park & Planning Commission depicting the property of the Capital Transit Co. and on a 1961 map prepared for the same commission surveying the property of the D.C. Transit System. Regarding such monuments, plaintiff's expert testified that "the engineers have shown U.S. monuments all along there, which one typically does when one wants to show a dividing line between one person's property and somebody else's property,"

futed defendant's contention that most of the grants to the railway operators in this area were easements, noting that his research indicated that all but perhaps one grant to the railway operator in this area were fee simple grants. Furthermore, plaintiff points out that an internal NPS memorandum dated February 12, 1957, noted that the C & O issued receipts when it sold right-of-ways to WMATA's predecessor. But, after an extensive search of Montgomery County land records by both title experts, no such receipts were found. Instead, those records indicated that all the parcels near Parcel D were purchased in fee simple from private property owners, thereby suggesting that the C & O may have never owned Parcel D and that the acquisition thereof in 1895 was made from a private property owner.[6]

Although the question is not free from doubt, at bottom, the court believes that plaintiff has proven, by a preponderance of the evidence, that Parcel D was obtained by WMATA's predecessor prior to 1938 and hence was not among the properties transferred by the C & O to the United States in that year. In this regard, the court finds particularly probative the largely uncontradicted testimony of plaintiff's title expert regarding the Mackall plat maps. While defendant was aware of plaintiff's reliance upon these maps, it apparently made no attempt to have its title expert review them, despite ample opportunity to do so. The court also finds especially probative the testimony regarding the monumenting of Parcel D, which, as described above, is more consistent with the notion that said property was owned by WMATA's predecessor in fee simple, rather than as an easement. As such, the termination of rail service in 1960 did not have any affect on the ownership of this property. Accordingly, under Maryland law, the court finds that plaintiff has provided "clear proof" that it, rather than the United States or any other party, owns Parcel D.[7]

### B. The Extent of the Encroachment

As noted above, another factor potentially affecting the difference in the parties' estimates of damages in this case, as well as the relief that ultimately may be granted here, involves their estimates of the physical extent of the taking. The plaintiff's appraisal expert, Ms. Carol Mitten estimated that the extent of the physical encroachment area was 129,580 square feet, while defendant's appraiser, Mr. Oakleigh J. Thorne put that encroachment at only 43,000 square feet. Each parties' estimate has its shortcomings. For example, Ms. Mitten's estimate was based upon an unrecorded survey. Yet, it was preferable to Mr. Thorne's estimate, which relied on a "legal description" of the property provided by the NPS that proved to be inaccurate (indeed, at trial, Mr. Thorne admitted that his calculation of the area of other portions of the property was erroneous). In the end, it appears that the differences between the two estimates hinge on

---

testifying further that "if one person owned a large tract of land, they wouldn't set up lines inside it."

6. Consistent with this view, plaintiff produced a 1916 copy of the Montgomery County, Maryland, tax assessment book. This map not only showed that Parcel D was owned by one of WMATA's predecessors, but also indicates that the properties on the approximate north and south of Parcel D were not then owned by the C & O, but rather by private property owners.

7. At trial and, particularly, in his post-trial brief, defendant's attorney belatedly attempted to raise issues regarding the ownership of other portions of the Cabin John (e.g., a Parcel E that adjoins Parcel D, as well as a segment at the end of the corridor). Relying on various deeds in the record, he also asserted that various portions of the property were only easements. These issues, however, were neither listed in the joint state-

ment of issues filed by the parties on October 12, 2001, nor identified by defendant in its pretrial submissions. As a result, these issues were not listed by this court as issues for trial. *See* Order of November 16, 2001. Because of this, plaintiff's counsel repeatedly objected when defendant's counsel attempted to inject these issues into the trial. Based on this course of events, this court determines that these additional issues concerning the ownership and nature of ownership of various tracts of the subject property were waived. *See McLean Contracting Co. v. Waterman Steamship Corp.*, 277 F.3d 477, 479–80 (4th Cir.2002); *Gorlikowski v. Tolbert*, 52 F.3d 1439 1442–44 (7th Cir.1995). This conclusion is unaltered by the fact that there is some evidence in the record bearing on these issues, as it remains that, due to defendant's conduct, plaintiff was denied an opportunity to present its evidence on these points.

who owns Parcel D—if WMATA owns that parcel, Ms. Mitten is correct; if it does not, then Mr. Thorne is right. Accordingly, because this court has concluded that WMATA owns Parcel D, it adopts, as its finding, Ms. Mitten's estimate that the physical encroachment occasioned by the taking here was 129,580 square feet.

### C. Estimates of Damage

Turning to the actual damage calculation, we begin with some first principles. Just compensation is "the full monetary equivalent of the property taken," the Supreme Court has stated, and "[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *Almota Farmers Elevator & Whse. Co. v. United States,* 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973); *see also United States v. 564.54 Acres of Land (Lutheran Synod),* 441 U.S. 506, 510–11, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979). This "monetary equivalent" has often been derived via formulae that incorporate the concept of fair market value. According to the conventional praxis, that value is what a willing buyer would pay in cash to a willing seller, neither being under any compulsion to buy or sell and both being fully informed and knowledgeable about all relevant matters. *See United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336 (1943). And since a hypothetical buyer could look to both existing and potential uses for the property, fair market value takes into consideration "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future … to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States,*

292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934).[8] *Olson,* the beacon by which many decisions in this area are steered, also teaches that the determination of market value is "to be made in light of all facts affecting the market value that are shown by the evidence taken in connection with those of such general notoriety as not to require proof." 292 U.S. at 257, 54 S.Ct. 704.

■ Consistent with these principles, in a takings case, where something less than the owner's entire property is taken, the Fifth Amendment permits compensation not only for the value of the part taken, but also for the diminution in the value of the owner's remaining property. *See United States v. Grizzard,* 219 U.S. 180, 183–85, 31 S.Ct. 162, 55 L.Ed. 165 (1911); *Sharp v. United States,* 191 U.S. 341, 351–52, 24 S.Ct. 114, 48 L.Ed. 211 (1903); *Bauman v. Ross,* 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897). "If only a portion of a single tract is taken," the Supreme Court has instructed, "the owner's compensation for that taking includes any element of value arising out of the relation of the part taken to the entire tract." *Miller,* 317 U.S. at 376, 63 S.Ct. 276. Burnishing what the Court, in *Miller,* termed "severance damages," *id.,* the D.C. Circuit later stated—

> The owner is entitled to receive, not the exact value of the part taken, but rather to receive the difference between the value of the whole unaffected by the improvement and the value of the remainder in the light of the improvement—"the loss caused to him by the appropriation" …

*Aaronson v. United States,* 79 F.2d 139, 140 (D.C.Cir.1935). The Court of Claims likewise opined in *Georgia–Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328, 336 (1980), that "[i]n circumstances where there is a partial taking of property, just compensation is mandated for any depreciation in value of the remaining property not taken which is occasioned by the partial taking."[9]

---

8. *See also McCandless v. United States,* 298 U.S. 342, 345–46, 56 S.Ct. 764, 80 L.Ed. 1205 (1936) ("The rule is well settled that, in condemnation cases, the most profitable use to which the land can probably be put in the reasonably near future may be shown and considered as bearing upon the market value."). Similar principles were recently applied by the Federal Circuit in

*Bd. of Cty. Supervisors of Prince William Cty., Virginia v. United States,* 276 F.3d 1359, 1364–65 (Fed.Cir.2002). *See also* 4 Nichols on Eminent Domain (hereinafter "Nichols") § 12.01 (2002).

9. *See also Hendler v. United States,* 175 F.3d 1374, 1383 (Fed.Cir.1999); *Navajo Tribe of Indians v. United States,* 9 Cl.Ct. 227, 255 n. 25

Accordingly, the basic yardstick for calculating severance damage is the "before and after rule," *i.e.*, the difference between the value of the property before and after the taking. *See* 8A Nichols at § 16.01[2]. Expert testimony ordinarily is essential in setting the minuend and subtrahend of this equation, often informed by the analysis of sales involving comparable parcels. This case is no exception. While it has sometimes been said, in half jest, that an "[e]xpert opinion is only an ordinary guess in evening clothes," *Earl M. Kerstetter, Inc. v. Commonwealth*, 404 Pa. 168, 173, 171 A.2d 163, 165 (1961),[10] the experts here clearly grappled with the unusual nature of the property to be valued. A better understanding of their reports provides a helpful starting point.

### 1. The Expert Reports

#### a. Plaintiff's Report

Plaintiff's expert witness, Ms. Mitten, opined that the damages suffered by plaintiff were $2,555,000. In her view, the highest and best use of the property before the taking was as an unbroken corridor for a hiker/biker trial. She based her opinion on a number of factors, among them her physical inspection of the Cabin John; its vistas of the C & O Canal and the Potomac River and links to popular and historical locations, among them, the Glen Echo amusement park; and the zoning of the property. In studying the potential use of the property as a hiker/biker trail, Ms. Mitten also consulted with representatives of the Washington Area Bicyclists Association and the national Rails to Trails Conservancy and obtained evidence regarding similar land acquisitions for trails, including a recent extension of the Capitol Crescent Trail in the District of Columbia and Maryland, as well as the proposed Metropolitan Branch Trail in Maryland and the District of Columbia. She also noted the proximity of the property to existing trails (*e.g.*, the Capital Crescent Trail and the C & O Canal towpath), and the corridor's connections to strategic entry and exit points, including several streets and neighborhoods. As is often the case in appraisals, in reaching this opinion, Ms. Mitten also made a number of critical assumptions, among them that: (i) the trestle bridges along the trolley line were structurally sound; (ii) the cost to remediate several contaminated soil areas would be approximately $30,000; (iii) the topography that prevailed along the trolley line when it was last used still prevailed; (iv) WMATA owned parcel D; and (v) the land defendant encroached upon amounted to 129,580 square feet. The latter two assumptions, of course, have since been validated by this court.

Based on the information she developed, Ms. Mitten obtained and reviewed data on what she viewed as comparable sales of rail corridors. Based thereupon, she estimated, as of June 1, 1999, a price of $350 per linear foot for the unencumbered portions of the Cabin John, and of $210 per linear foot price for the portions of the property that were encumbered by surface easements.[11] Ms.

(1985); 8A Nichols at § 16.01[1]; James Timothy Payne, Annotation, *Eminent Domain: Unity or Contiguity of Separate Properties Sufficient to Allow Damages for Diminished Value of Parcel Remaining After Taking of Other Parcel*, 59 A.L.R.4th 308, 374, 1988 WL 546633 (1988).

10. Twenty years earlier the Supreme, Court, in somewhat more politic terms, stated that "the application of . . . [the market value] . . . concept involves, at best, a guess by informed persons." *Miller*, 317 U.S. at 375, 63 S.Ct. 276.

11. The following chart summarizes the comparable sales that Ms. Mitten reviewed:

| # | Location | Length | Avg. Width | Date | $/Sq. Ft. | $/Lin. Ft. |
|---|----------|--------|-----------|------|-----------|-----------|
| 1 | Glen Echo, Md. | 0.31 miles | 30' | 4/96 | $1.80 | $ 54.55 |
| 2 | Bethesda, Md. | 6.45 miles | 89' | 12/88 | $3.30 | $293.50 |
| 3 | Washington, DC | 4.55 miles | 60' | 11/90 | $7.28 | $440.54 |
| 4 | College Pk., Md. | 3.30 miles | 30' | 4/97 | $0.10 | $ 3.07 |
| 5 | Lanham, Md. | 3.91 miles | 66' | 5/95 | $0.02 | $ 1.58 |

Mitten multiplied the per foot figures by the number of linear feet of the corridor to which they were applicable, as the following chart summarizes:

Fee Simple Portion
12,602' × $350/linear foot      $4,410,700
Encumbered Portion
2,798' × $210.00/linear foot      $ 587,580
**Total**      $4,998,280

She rounded the total to $5,000,000 and then subtracted therefrom $45,000, corresponding to the estimated cost of remediating the property, which she derived from an environmental study thereof.[12] This yielded a before-the-taking figure of $4,955,000. From this figure, Ms. Mitten subtracted an after-taking value for the Cabin John of $2,115,000; the latter value was calculated by assuming that the highest and best use of the property was to be disaggregated and sold to the adjoining landowners over a 5–year period. She thereby calculated the severance damages occasioned by the taking at $2,840,000 ($4,955,000 minus $2,115,000). In a supplemental report finalized on November 28, 2001, Ms. Mitten adjusted this figure for inflation, back from her original June 1, 1999, study date to the October 30, 1995, taking date, thereby yielding a final damage figure of $2,555,000.

### b. Defendant's Report

Where Ms. Mitten saw potential, Mr. Thorne espied mostly problems.

Mr. Thorne set the value of the loss occasioned by the taking at $22,000, a nifty $2.5 million less than plaintiff's estimate. He testified that he could not determine a viable economic highest and best use for the Cabin John before the taking. In the first of his reports, this conclusion was driven by his assumption that the Parcel D was owned by the United States and that the property thus was not continuous. In a subsequent report, however, Mr. Thorne assumed that the property was uninterrupted, but still readily concluded that there was no viable use thereof. Consistently throughout all his reports, he also focused on the topography and state of the property, the length of the property (which he viewed as too short), the property's asserted lack of connectivity to historic points, and his inspection of the major structures located thereon, particularly several trestles. He also based his "no highest and best use" determination on an environmental study prepared by Engineering Consulting Services, Ltd., which found that the property suffered from soil erosion and contamination by lead and arsenic (the latter owing, at least in part, to the deterioration of paint on the trestles). In his view, the value of the property as a hiker/biker trail, even assuming the property was continuous, was highly speculative because of the probable necessity of having to remove and replace the trestles along the route [13] and the need to address the soil erosion and contamination.

As further basis for rejecting the hiker/biker trail concept, Mr. Thorne noted that "land acquisitions for recreational trails funded by public authorities are not comparable

| 6 | Bowie, Md. | 2.05 miles | 66' | 12/93 | $0.24 | $ 15.60 |
| 7 | Bowie, Md. | 0.27 miles | 66' | 5/96 | $0.06 | $ 4.06 |
| 8 | Bowie, Md. | 2.48 miles | 33' | 5/99 (Asking) | $0.23 | $ 7.65 |

Ms. Mitten viewed comparables 2 and 3 as being the best indicators of value here because they represented existing corridors roughly in the same geographical area as the Cabin John. Ms. Mitten focused on the linear foot rates for those sales because, in her view, the length of a corridor is more important than its width. She rounded the weighted average of the linear foot prices for comparable 2 and 3 in deriving her $350 per foot figure.

12. This expert study estimated that the cost of removing lead contaminants that had collected under two the trestles along the route would be $30,000. To take into account the fact that the property had three trestles, Ms. Mitten simply extrapolated this figure to 45,000.

13. Among other things, Mr. Thorne determined that the foundations for the trestles were seriously rusted and had been severely weakened by erosion. He concluded that the trestles were hazardous structures that had to be removed and thus constituted a liability on the value of the property.

to the private sector transactions used in this appraisal," observing further that "these acquisitions produce no return on invested capital as there are no user fees." In addition, he noted that several local governmental units he had contacted "voiced no interest in the corridor," taking that as an indication that no potential qualified purchasers existed and, as such, precluding the use of such a hypothetical purchase under the market value standard. In sum, he found that "there is no feasible marketability for the abandoned right-of-way as a single uninterrupted corridor."

In setting a value for the property as of August 18, 2000, Mr. Thorne initially looked at properties with "development impairments," such as flood plains and poor topography, and adopted a before value of $0.65 per square foot. However, when he revised his report to reflect a taking as of October 30, 1995, Mr. Thorne, despite adhering to his view that the property was not suitable for use as a recreational corridor, used data from several comparable corridor sales derived a land value of $0.50 per square foot.[14] He multiplied the $0.50 per square foot figure times what he estimated as the total land area of 317,988[15] to produce a preliminary before value of the Cabin John of $158,994, rounded to $160,000. Mr. Thorne, however, estimated that, in 1995, the costs associated

with the remediation of the Cabin John exceeded $267,000, noting further that this figure did not include the expense to clear an access route to the trestle locations for the delivery of equipment and the hauling away of waste. Because these expenses exceeded the preliminary before value of the property, Mr. Thorne found the "before taking" value of the property to be $1 as of October 30, 1995. Applying a similar methodology, Mr. Thorne then found that the "after taking" value of the property was also $1—this calculation again was driven by the remediation costs associated with the property that was not taken.

Ultimately, Mr. Thorne shifted his focus away from "severance damages," to calculate what he viewed as the "direct damages" due to the taking. He derived this figure by multiplying the same unit value of $0.50 per square foot times the area of the land taken, which he calculated as 43,785 square feet, to derive a figure of $22,000. In his view, this figure represented the entire damages attributable to the taking because "[t]here are no indirect or severance damages to the remaining land areas as the takings have no impact on the use of the remaining land."

**2. Reconciliation**

Because this court has determined that WMATA owns Parcel D, it will not discuss

---

14. Mr. Thorne's report summarized the results of several recent "comparable corridor sales," as follows:

| # | Location | Length | Avg. Width | Date | $/Sq. Ft. | $/Lin. Ft. |
|---|----------|--------|-----------|------|-----------|-----------|
| 1 | Glen Echo, Md. | Unknown | Unknown | 10/95 | Unknown | Unknown |
| 2 | Glen Echo, Md. | 0.31 miles | 30' | 6/00 | $1.90 | $54.50 |
| 3 | College Pk., Md. | 3.33 miles | 30' | 4/97 | $0.10 | $ 3.07 |
| 4 | Bowie, Md. | 0.29 miles | 66' | 5/96 | $0.06 | $ 3.79 |
| 5 | Bowie, Md. | 3.91 miles | 66' | 5/95 | $0.02 | $ 1.58 |
| 6 | Bowie, Md. | 2.05 miles | 66' | 12/93 | $0.24 | $15.60 |

In setting the land value at $0.50 per square foot, Mr. Thorne concluded that comparable 2, despite involving a portion of the Cabin John itself, was not comparable because the land had been purchased not for corridor purposes, but rather to prevent development of under-sized lots lying along the right-of-way. Nonetheless, Mr. Thorne adopted a figure higher than the rest of the comparables he reviewed because "[t]he subject lies in an area of very high land prices, as evidenced by the Town's cost to acquire a portion of the former right-of-way." Notably, in his first report, dated August 6, 1998, which calculated the property as of July 31, 1998, Mr. Thorne also derived a land value of $0.50 per square foot, but did so based upon comparables involving the impaired property.

15. At trial, it was determined that Mr. Thorne, in fact, had underestimated the square footage of the Cabin John, which actually comprised an area of 668,583 square feet.

the expert reports to the extent that they assume the United States owns that parcel. The differences between Mr. Thorne's subsequent report evaluating the property as a corridor as of October 30, 1995, and Ms. Mitten's similarly-focused report can be attributed to three main factors. First, at least to a point, the experts employed different assumptions regarding the before-taking, best and highest uses of the Cabin John and, based upon these views, used different assumptions regarding which properties were most comparable in making their appraisal. Second, they adopted dramatically different assumptions regarding the conditions of the property, particularly as to the costs for stabilizing the trestles and addressing other environmental hazards on the property. Finally, the experts employed different methodologies in valuing the after-taking value of the property, with plaintiff employing an "across-the-fence" approach that assumed, contrary to the facts, that private owners, rather than the United States, owned the surrounding property. Unwilling to indulge in the latter fiction, defendant categorically rejects this across-the-fence approach. In attempting to extrapolate a value for the damage caused here, the court will analyze each of these considerations *seriatim.*

### a. The Before–Taking Value

The record is not altogether clear as to how Mr. Thorne derived his various values for the property. His final report is inconsistent with his earlier reports in that, while he adheres to his view that the Cabin John is unsuitable as a corridor, he, nonetheless, uses corridor sales as the basis for his valuation. At trial, however, Mr. Thorne seemingly had yet another change of heart, harkening back to his earlier appraisals, which did not employ corridors as comparables, to focus instead on properties with some form of development impairment, such as flood plains or irregular topography. While Mr. Thorne's methodology is somewhat obscure and certainly shifting, his conclusions are steadfast—he concluded that the property was not suitable for use as a corridor and, for whatever reasons, set the value at $0.50 per square foot. The court will review these conclusions, together with those of Ms. Mitten, in light of the record, recognizing, of course, that the burden of proof here lies on the plaintiff.

Even with that burden, it appears that Ms. Mitten has the better case in concluding that the Cabin John was marketable as a corridor. As she found, the property is scenic, often with unobstructed views of the Potomac River and the C & O Canal. While imbued with its own historical significance, more importantly, the old trolley line could have readily linked existing hiker/biker trails, streets and subdivisions with better-known historical landmarks, including not only the canal, but also the Glen Echo Amusement Park and the Inn at Glenn Echo.[16] That both experts identified seven or eight sales of corridors—most of which were purchased for hiker/biker trails, in Maryland and the District of Columbia within a seven to eight year period—certainly suggests the existence of a market for such property based, at least in part, on the need for recreational and tourist opportunities in the burgeoning Washington, D.C. metropolitan area. And, these other sales

---

**16.** Based on its expert's testimony, defendant assert that the cited linkages do not exist. The court, however, conducted a site visit during which these linkages actually were seen—streets, neighborhoods and landmarks that clearly intersected the trial—and testimony at trial from Ms. Mitten validated these observations. She pointed out, among other things, that plaintiff owns additional adjoining property, apart from the Cabin John, that could supply an additional linkage to the Capital Crescent Trail. In such circumstances, the court finds that there was a reasonable probability, at the time of the taking, that the subject properties could be linked as indicated. *See United States, ex rel. TVA v. Powelson,* 319 U.S. 266, 275–76, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); *Bd. of Cty. Supervisors of Prince William Cty.,* 276 F.3d at 1364–65. To be sure, these additional linkages would not be without costs—for example, some of the intervening terrain is hilly—but the record evidence, on balance, suggests that the linkages necessary to make the property viable as hiker/biker trail were either already in existence or, at least, reasonably probable. Indeed, while extraordinary development costs might constitute a drag on the value of the property, there is no indication here that the development costs for this parcel would be dramatically different from those encountered in the comparables studied by the appraisers, most of which also involved former rail beds.

involved properties that suffered from some of the same problems as Cabin John Properties—the presence, for example, of at least one aging trestle in need of repair or replacement. That so many sales occurred over such a relatively short period of time is likely not a coincidence, given Congress' passage of the Rails–to–Trails program, which was designed to spur the conversion of former rail corridors into hiker/biker trails. *See* the National Trails System Act Amendments of 1983 (Rails–to–Trails Act), Pub.L. No. 98–11, 97 Stat. 48 (codified as amended at 16 U.S.C. § 1241, et seq.); *see also Preseault v. I.C.C.,* 494 U.S. 1, 5–7, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (describing this program).[17]

Nonetheless, at least initially, Mr. Thorne concluded that the property was not suitable as a corridor and thus should not be valued as such. Originally derived from the assumption that Parcel D was owned by the United States, this conclusion ultimately seems more attributable to defendant's cramped notion of two key valuation concepts—what is a market and, relatedly, what is the highest and best use of property. As to the former, Mr. Thorne seemed to construe his assigned task as requiring him to identify an immediate and specific purchaser for the property—the NPS or Montgomery County, for example. Yet, various courts have observed that "[t]he willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the characteristics of these hypothetical persons are not necessarily the same as the personal characteristics of the actual seller or

a particular buyer." *Caracci v. Comm'r,* 2002 WL 1023378 (T.C.2002). As noted in a leading treatise, "[t]o establish market value, it is not necessary to point out any designated person able and willing to buy the property at the price alleged (or at any price). . . . The actual facts of this character are neither controlling nor usually even material." 4 Nichols at § 12.02[2] at 12–80 (citing cases).[18] For Mr. Thorne, however, the lack of a specific buyer for the Cabin John took on controlling proportions, particularly because of what he viewed as the idiosyncrasies of the subject property.

■■■ Content seemingly to view the Cabin John only in its current down-trodden state, Mr. Thorne also assumed that the property had to be readily adaptable to its new use, with minimal alteration, and, as adapted, immediately needed. To be sure, "[j]ust compensation may not be predicated on potential uses which are speculative or conjectural." *Fordyce v. United States,* 7 Cl.Ct. 591, 600 (1985) (citing cases). But, the Supreme Court, in *Olson,* chose to incorporate some flexibility into the notion of what is a property's highest and most profitable use, stating that such use is that "for which the property is *adaptable* and needed or *likely to be needed* in the *reasonably near* future." *Olson,* 292 U.S. at 255, 54 S.Ct. 704 (emphasis added); *see also Bd. of Cty. Supervisors of Prince William Cty.,* 276 F.3d at 1365. Accordingly, the law is firmly established that the highest and best use for the property need not be an inevitability, nor even an

---

**17.** This statute, of course, has been the subject of considerable litigation in this court. *See, e.g., Glosemeyer v. United States,* 45 Fed.Cl. 771 (2000); *Chevy Chase Land Co. of Montgomery Cty., Md. v. United States,* 37 Fed.Cl. 545 (1997), *affd,* 230 F.3d 1375 (Fed.Cir.1999). Notably, it anticipates the transfer of rail right-of-ways not only to governmental entities, but also to private entities. *See* Rails–to–Trails Act, Section 8(d), codified at 16 U.S.C. § 1247(d) (noting that Congress wished to encourage "private interests to establish appropriate trails using the provisions of such programs").

**18.** *See also id.* at § 12C.01[1] ("[I]t must be remembered that market value is always based on hypothetical conditions and it is never necessary to show that a willing buyer and willing seller do in fact exist."). In hinting to the contrary, defendant cited a document entitled "Uniform Ap-

praisal Standards for Federal Land Acquisitions," essentially a white paper that was drafted by the Interagency Land Acquisition Conference. The conference, however, was an amalgam of Federal agency representatives, chaired by the Assistant Attorney General of the Land and Natural Resources Division. *See* Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions v (1992). In the court's view, this document, which has roundly been criticized by various commentators, is entitled to little more weight than a brief filed by defendant. *See* H. Dixon Montague, "Preservation Value and the Use of Sales to Government Agencies as Evidence of Value" (hereinafter "Preservation Value"), SC45 ALI–ABA 81, 98 (1998) (citing additional critiques); *see also* discussion, *infra,* at footnote 21.

extraordinary likelihood, but only a reasonable probability—the "realistic, objective potential uses" of the property control. *Stanley Works v. Comm'r*, 87 T.C. 389, 400, 1986 WL 22172 (1986); *see also Olson*, 292 U.S. at 255, 54 S.Ct. 704; *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir.1958), *cert. denied*, 358 U.S. 921, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958).[19] Based upon the facts cited by Ms. Mitten, summarized above, as well as its visit to the site, the court concludes that the use of the corridor as a hiker/biker trail was such a reasonable probability, thereby corresponding to the highest and best use of the property prior to the taking.

In adopting this view, the court has eyed carefully the development of similar trails in the Washington metropolitan area around the time of the taking. That a number of corridors were sold and became trails within several years of the taking here suggests to the court that a functional market for such properties existed—in at least one of his reports, Mr. Thorne, in fact, grudgingly relied on these very sales as comparables, conceding, at least tacitly, that these sales were indicative of the subject property's value. At the least, such sales indicate that this corridor is not so-called "special purpose property" of a type "so infrequently traded that [the court] cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property." *Lutheran Synod*, 441 U.S. at 513, 99 S.Ct. 1854; *compare Kimball Laundry Co. v. United States*, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949). *See also Fordyce*, 7 Cl.Ct. at 598–99; *Eaton's Real Estate Valuation in Litigation* 228–29 (2d ed. 1995) ("One significant criterion of a special-purpose property is that there is no market for the property, as demonstrated by the lack of comparable sales data."). Even were this otherwise, the Supreme Court and other courts have held that sales of comparables, are still relevant in assessing the value of special purpose property. *See, e.g., United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402, 70 S.Ct.

217, 94 L.Ed. 195 (1949) (finding the fact that there is no market "does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property"). Nothing about the comparables here then seemingly makes them any more or less reliable than the comparables ordinarily wielded by expert appraisers in valuation cases.

Not so, protests defendant. In a *motion ad limine* filed before trial, defendant asserts that because the proposed highest and best use of the property would not generate a return on invested capital (*e.g.*, income), it is an improper basis for estimating market value. Similar sentiments were expressed by Mr. Thorne in his written appraisal. This conclusion, defendant asservates, proceeds from the statement in *Olson* that property should be valued at its "highest and *most profitable* use," 292 U.S. at 255, 54 S.Ct. 704, with defendant interpreting the italicized phrase as meaning income-producing. *Per contra*. Nothing about the Court's use of the word "profitable" suggests this—Webster's Dictionary defines "profit" not in monetary terms, but simply as a "valuable return," and likewise defines "profitable" as "affording profits: yielding advantageous returns or results." *See* Merriam–Webster's Collegiate Dictionary 931 (10th ed.1998). Moreover, defendant's limiting construction defenestrates that portion of *Olson* in which the Court broadly stated the potential use of the property should be considered "to the full extent that the prospect of demand for such use affects its market value." *Olson*, 292 U.S. at 255, 54 S.Ct. 704. It also ignores the origins of the highest and best use concept in the Court's earlier decision in *Mississippi & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 25 L.Ed. 206 (1878), upon which *Olson* primarily relied. *Olson*, 292 U.S. at 255, 54 S.Ct. 704. There, the Court instead talked of the land's capacity to "subserve the necessities or conveniences of life," indicating further that "[i]ts capability of being made thus available gives it a market value which can be readily estimated." *Patterson*, 98 U.S. at

---

19. From time to time, this opinion will cite tax cases for various propositions involving the determination of fair market value. It should be noted that in that context, the same precedents often encountered in condemnation cases, *Olson* among them, are often applied.

408. Cases applying *Olson,* indeed, have not hesitated to find, based on the presence of desired amenities and often at defendant's behest, that the highest and most profitable use of certain property was for recreation or conservation.[20] These cases focus on the reasonably probable use which results in the highest value, whether or not that use is directly income-producing.[21]

■ The real issue, then, is whether a functional market exists for property used in the fashion envisioned so as to provide an accurate barometer for projecting the value of the taken parcel in a hypothetical willing buyer/willing seller transaction. Defendant contends that the transactions by which public agencies acquire property for preservation, conservation, recreation or other like public purposes do not establish such a market because they are not monetarily motivated. While this proposition is seemingly cut from the same cloth rejected above, defendant, in support thereof, invokes the so-called "public interest value" doctrine. Under that doctrine, "[w]here, however, a market for a particular use is created solely as a result of the project for which the land is condemned, value based on that use must be excluded." *United States v. 46,672.96 Acres,* 521 F.2d 13, 15–16 (10th Cir.1975).[22] Courts have limned at least two rationales for this rule: (i) that, in these sales, the condemning authority is usually compelled to buy and the landowner, under the power of eminent domain, is com-

pelled to sell, therefore causing such transactions to flunk the "willing buyer/willing seller" test; and (ii) because such payments reflect a desire to avoid a lawsuit. *See, e.g., United States v. 10.48 Acres,* 621 F.2d 338, 339–40 (9th Cir.1980); *Transwestern Pipeline Co. v. O'Brien,* 418 F.2d 15, 18 (5th Cir.1969). Defendant insists that application of the doctrine here requires this court to disregard the other corridor sales and conclude that there is no true market for hiker/biker trails.

■ This insistence is misplaced. To be sure, in assessing whether a market exists, only sales conducted under true market conditions—ones that involve a willing buyer and a willing seller, which occur without compulsion—should be considered. That is why, under the public interest value doctrine, courts generally have eschewed sales occurring via condemnation or the threat thereof as part of the same project in which the property to be appraised is also being condemned. Such condemnation sales are defective not only because they are involuntary, but also because they often reflect the unique value of the property to the taker, a consideration wholly irrelevant in a fair market value analysis. *See Miller,* 317 U.S. at 375, 63 S.Ct. 276. But, that is not the case here.

For one thing, on our facts, the public interest value doctrine is irrelevant—the market for hiker/biker trails was not created

---

20. *See, e.g., United States v. 7.92 Acres of Land,* 769 F.2d 4, 12 (1st Cir.1985); *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 159 (1990), *aff'd,* 28 F.3d 1171 (Fed.Cir.1994); *United States v. 14,003.49 Acres of Land,* 570 F.Supp. 1367, 1371–72 (W.D.Mich.1983); *Strasburg v. Comm'r,* 79 T.C.M. (CCH) 1697, 1704 (2000); *Environmental Preservation Co. v. Comm'r,* 63 T.C.M. (CCH) 2117, 2124 (1992). As noted, in many of these cases, defendant or one of its agencies was the one arguing in favor of a recreation or conservation use. Several of the reported cases are estate tax cases in which the Commissioner of Internal Revenue, relying on *Olson,* successfully argued that the highest and best use of property was recreational in an effort to urge the court to adopt a higher value of the subject property for estate tax purposes. *See, e.g., Strasburg, supra.*

21. While the Federal Interagency Land Acquisition Conference took a position similar to that advanced by defendant here, the 1997 version of the Uniform Standards of Professional Appraisal

Practice defines "highest and best use" as simply "[t]he reasonably probably and legal use of property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Uniform Standards of Professional Appraisal Practice 154 (1997). This definition is consistent with the views expressed above.

22. *See also Miller,* 317 U.S. at 375–76, 63 S.Ct. 276 ("If, however, the public project from, the beginning included the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken."); *Olson,* 292 U.S. at 256, 54 S.Ct. 704 ("[T]he value to be ascertained does not include, and the owner is not entitled to compensation for, any element resulting subsequently to or because of the taking."); *Navajo Tribe of Indians v. United States,* 176 Ct.Cl. 502, 364 F.2d 320, 342 (1966) (same); *Fordyce,* 7 Cl.Ct. at 600 (same).

as part of the same project that might have encompassed the conversion of the Cabin John to such a trail. In fact, the other hiker/biker trails studied here were acquired long after the Cabin John ceased to exist as a corridor. Nor, more importantly, does the rationale underlying the public interest value doctrine resonate here. For example, there is no indication that the corridor sales identified by Ms. Mitten, most of which were also used in one of Mr. Thorne's reports, were the result of any exercise of eminent domain powers or the threat thereof. Instead, by all appearances, these were voluntary transactions that appeared to reflect such traditional indicia of market value as the location of the property, its topography and its other potential uses—the type of public sales courts commonly have considered under exceptions to the public interest value rule. *See, e.g., Transwestern Pipeline Co. v. O'Brien*, 418 F.2d at 19; *United States ex rel. Tennessee Valley Auth. v. Easement and Right of Way in Madison County, Tennessee*, 405 F.2d 305, 307 (6th Cir.1968).[23] The record herein thus amply supports the conclusion that the property has a readily discernible value as a hiker/biker trail, that there is a market for such properties, and that the value of the Cabin John, therefore, can be derived using traditional fair market value assumptions.

In choosing this path, the court finds particularly unpersuasive Mr. Thorne's attempt to deconstruct the apparent market for the corridor in question by contacting "decisionmakers" for the state and local governments to see if they were interested in acquiring a right of way on the property. As noted above, this buyer-specific approach first collides headlong with traditional market value

concepts. Even were that not true, it remains that this particular survey was poorly executed. It appears that most, if not all, of Mr. Thorne's hierarch contacts were "cold" calls, in which, without any prelude or prior warning, he simply called the official and asked him if he was interested in buying a corridor—for all appearances, like a telephone solicitor selling magazine subscriptions. In fuzzily recounting these calls, Mr. Thorne admitted that he neither described the property in any great detail nor even asked the decisionmakers whether they would have been interested in the property as an uninterrupted corridor (as opposed to one sliced by the Parkway).[24] Moreover, he admitted that he did not ask these officials whether they would have been interested in the property as of October 30, 1995, so as to distinguish between current and past needs, and thus did not ascertain whether acquisitions made after the taking date had diminished the officials' current need for the property.[25] Mr. Thorne's choice of whom to solicit also is suspect. While, for example, he contacted two different arms of the NPS—essentially the defendant in this case—which predictably were disinterested in acquiring the property over which they were being sued, he did not contact any private citizen groups or foundations, despite knowing that such entities have often proven to be important catalysts for the construction of hiker-biker trails. At best, then, his contacts gauged nothing relevant to this litigation; at worst, they were little more than a contrivance, calculated to confirm a preconception that the property could not be used as a corridor. Whether skewed or just poorly executed, this unscientific and

23. A similar distinction, indeed, was made in *Olson*, where the Court stated: "It is common knowledge that public service corporations and others having that power frequently are actual or potential competitors not only for tracts held in single ownership but also for rights of way, locations, sites, and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account." 292 U.S. at 256, 54 S.Ct. 704.

24. Mr. Thorne's testimony on this point was somewhat conflicting. On direct testimony he

seemed to suggest that they had discussed the property's characteristics in detail, while on cross-examination and under questioning by the court, he stated that he provided only the most basic of details regarding the property. In assessing Mr. Thorne's credibility, the court believes that the latter statements reflect more accurately what actually occurred here.

25. This omission might have been particularly critical in dealing with optical cable companies as the record reveals that at some undefined point over the last decade such optical cable was laid along portions of the Clara Barton Parkway.

overly simplistic "survey" then is little more than gewgaw and gimcrack, and bears none of the weight defendant piles upon it.[26]

So what is the correct before-value of the Cabin John? Certainly, there is a veritable chasm between the values derived by the parties—Ms. Mitten and Mr. Thorne set that value at $4,955,000 and $1, respectively. In bridging this colossal gap, the court is not required to accept one or the other of these widely divergent opinions—unlike some cases, the ascertainment of value here is neither controlled by simple application of the burden of proof nor some other handy legal formula. *See Toronto,* 338 U.S. at 402, 70 S.Ct. 217. Rather, as the Court of Claims explained in itself dealing with a thorny issue of valuation, it is for this court to "synthesize in its mind the ... record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence, perhaps, though not identified with any of it." *United States v. Northern Paiute Nation,* 183 Ct.Cl. 321, 393 F.2d 786, 800 (1968); *see also United States v. Miller,* 317 U.S. 369, 374–75, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *Righter v. United States,* 194 Ct.Cl. 400, 439 F.2d 1204, 1217 (1971). Ultimately then, particularly in the context of setting just compensation, and especially where dealing with irregular parcels, valuation transcends mere mathematical calculation, and involves the exercise of judgment—first by the experts and ultimately by the court. *See Standard Oil Co. of New Jersey v. Southern Pacific Co.,* 268 U.S. 146, 156, 45 S.Ct. 465, 69 L.Ed. 890 (1925) ("It must be remembered in condemnation cases valuation is not a matter of mere mathematical calculation, but involves the exercise of judgment."); 4 Nichols at § 12.01. In exercising its judgment, the court may embrace an expert's opinion *in toto,* or may pick and choose the portions of the opinion to adopt. *See Helvering v. Natl. Grocery,* 304 U.S. 282, 294–95, 58

S.Ct. 932, 82 L.Ed. 1346 (1938); *Caracci,* 2002 WL 1023378.

In the instant case, the court's focus goes immediately to the comparables identified by both experts. To facilitate analysis of those transactions in light of the record, the comparables identified by the experts can readily be broken into several categories. The first involves a sale of a portion of the property at issue to the town of Glen Echo for $54.50 per linear foot in 2000. This sale, of course, postdates the severing of the corridor by the Clara Barton Parkway and was apparently made to prevent property owners in the town from expanding their undersized lots and building new or larger houses thereon. The second group involves two properties that were sold to create the Capital Crescent Trail, a portion of which, as noted previously, runs near the subject property. The first segment of this trail, 6.45 miles in Bethesda, Maryland, was sold in 1988 at $293.50 per linear foot, while the second, a 4.55 mile passage in Washington, D.C., was sold in 1990 for $440.54 per linear foot. Like the Cabin John, these properties included at least one rotting trestle and other remnants of their rail use that needed to be repaired, replaced or remediated; unlike the property in question, the D.C. portion of this property apparently was wide enough for building townhouses. A third group—actually a single transaction—involved the acquisition of 3.3 miles in College Park, Maryland, from 1988 through 1990, at a rate of $3.07 per linear foot. While this property was used to create a hiker-biker trail, that trail apparently lacks proximity to any particularly scenic views or historical landmarks. The fourth and final group was a set of four parcels purchased in Lanham and Bowie, Maryland, with the intent of combining them into a trail, with prices varying from $1.58 to $15.60 per linear foot. Like the parcel in College Park, however, this land was generally unremarkable and, indeed, apparently included some flood plains.

---

**26.** Likewise misplaced is defendant's assertion, made in its post-trial reply brief, that the "prior forty-plus year history of the subject land with no identifiable market activity whatsoever ... further undermines the reasonable probability of plaintiff's proposed highest and best use." In so arguing, defendant dons blinders to the fact that during this entire "forty-plus year history," the Clara Barton Parkway has bisected the property, a fact which plaintiff was obviously entitled to ignore in ascertaining the before-value for the property.

In the court's view, the transactions involving the property in College Park, Lanham and Bowie, that were emphasized by Mr. Thorne, are not comparable to the Cabin John because: (i) these properties neither contain vistas of the Potomac River or comparable areas of natural beauty, nor link with historical landmarks such as the C & O Canal and the Glen Echo Amusement Park; and (ii) are in geographic areas with substantially lower land prices. On the other end of the spectrum, the sale involving the D.C. portion of the Capital Crescent trail, which was stressed by Ms. Mitten, involved property that had some housing potential, a factor which undoubtedly drove up its value substantially. This land also lies in areas (*e.g.*, near Georgetown) that generally have real estate prices higher than the subject property. While no evidence was adduced that the Bethesda portion of the trail was suitable for housing, the court notes that the average width thereof was greater than the D.C. portion's width—89 feet versus 60 feet, respectively. Both of these widths, of course, are considerably greater than the 30 foot average of the subject property. Notably, Ms. Mitten's report also indicates that the Maryland portion of the trail was purchased with a view of converting it to light-rail mass transit—indeed, it has been covered with gravel, rather than the asphalt band more typical of hiker/biker trials, in order to facilitate such a future conversion. This factor undoubtedly increases its value as compared to the subject tract.

In the court's view, the two most comparable sales involve the Bethesda portion of the Capital Crescent Trail and the portion of the subject property sold to Glen Echo. As to the former, however, the court believes that the price per linear foot must be considerably reduced to take into account the much greater width of the Bethesda property and its potential for light rail. While Ms. Mitten testified that the length of a corridor impacts its value more than its width, this rule obviously has its limits and must yield when the corridor is wide enough to serve valuable non-corridor purposes. The court believes that if a corridor is wide enough to accommodate more profitable uses, its square, rather than linear, footage is a better indicator of its value. As the Bethesda property is, on average, three times as wide as the Cabin John and, unlike the subject property, potentially suitable for commuter light-rail, the court finds that an appropriate per linear foot price for the property in question is approximately one-third that of the Bethesda property, or $97.67 per linear foot. This reduced value, as compared to the Bethesda property, is also warranted by the fact that the corridors which became the Capital Crescent trail were much longer than the subject property— something that both Ms. Mitten and Mr. Thorne indicated should be a factor in assessing the value of a corridor.

For that portion of the subject property that is encumbered by rights-of-way, the court further concludes that the sale to Glen Echo, which involved a segment of the Cabin John that was so encumbered, reflects an appropriate price and, therefore, sets the price of this portion of the property at $54.55 per linear foot.[27] As further evidence that this latter figure is an appropriate value, the court notes that the ratio of its unencumbered to encumbered linear prices ($97.67 to 54.55) is roughly the same as that derived by Ms. Mitten in her report ($350 to $210).

It remains for the court to multiply these figures by the appropriate corresponding footage, the results of which are reflected in the following chart:

Fee Simple Portion

| | |
|---|---|
| 12,602′ × $97.67/linear foot | $1,230,837 |

Encumbered Portion

| | |
|---|---|
| 2,798′ × $54.55/linear foot | $ 152,631 |
| **Total** | **$1,383,468** |

---

27. Defendant notes that the Cabin John, as well as various other properties, were sold at auction for $42,000 in 1995. While defendant admits, as it must, that auctions generally do not provide an adequate barometer of value, *see BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (citing cases), it nonetheless, contends that the auction price suggests that any value for the property that is not nominal is excessive. The court notes, however, that the unusual formation of the property and its relatively narrow potential uses makes it particularly unlikely that its value would be derived at auction. As such, in the court's view, the auction price cited by defendant is not probative of the property's true value.

Accordingly, considering the evidence as a whole and focusing, in particular, on the expert reports and the comparables analyzed therein, the court finds that the preliminary before-taking value of the Cabin John is $1,383,468.

### b. The Trestles and the Need for Decontamination

■ While the cost of development may or may not impact on the value of a parcel, the presence of a safety hazard undoubtedly diminishes that value. *See American Alliance Ins. Co. v. Jencraft Corp.*, 21 F.Supp.2d 485, 487 (D.N.J.1998). Apart from the basic economics of exchange values, remediation of the hazard is necessary before, in the words of *Olson, supra*, the remaining land can be available for its highest and best. *See* 4 Nichols at § 13.02[2].

In fact, the parties agree that the cost of remedying safety hazards on the property should be factored into the ultimate before-taking value of the property, and that one category of such costs involves remedying soil contamination on the property. They differ, however, not only in their estimates of these remediation costs, but also in assessing the impact of the three deteriorating trestles on the Cabin John. As noted above, Ms. Mitten estimated the cost of remediating the soil at $29,000, but assumed that the trestles were structurally sound and that no costs would be incurred for their removal or repair. For his part, Mr. Thorne found that the same trestles were severely weakened, so much so as to constitute a hazard and liability against the value of the property. He estimated that the cost of dealing with two of these trestles (as well as the soil contamination) exceeded $300,000, and, in fact, believed that this expense might be much higher based on the relative inaccessibility of the property.

In the court's view, Mr. Thorne's assumptions and findings regarding the cost of remediating the soil and trestles are generally more reasonable than those of Ms. Mitten.

To be sure, in his report, Mr. Thorne caveated that he did not have any formal engineering experience and that his views regarding the trestles were not based on a technical study. However, during its site visit, the court inspected the trestles and found that they were in a serious state of disrepair—for example, most of the underlying supports on one trestle, which had previously been anchored in concrete foundations, were instead entirely rusted away and hung into space, like the irregular teeth of an enormous broken comb. Moreover, as testimony in the record reveals, the concrete foundations themselves had been severely damaged, undercut by erosion and, in some cases, were entirely out of the ground. And the wooden decks of the trestles also appeared in serious disrepair. The deterioration was so serious that it undoubtedly existed as of the October 30, 1995, taking date. Thus, while an engineer undoubtedly could have made more sophisticated findings regarding the structural integrity of the trestles, or the lack thereof, the state of disrepair was so severe and evident to the naked eye that it is beyond peradventure that Mr. Thorne's assumptions regarding the need to address the situation are more reasonable than those of Ms. Mitten.

Regarding the actual cost of remediating the soil and trestles, the court finds that Mr. Thorne's estimate of $300,000 is reasonable. Indeed, in her testimony, Ms. Mitten admitted that if the trestles truly needed to be repaired or dismantled, she agreed with Mr. Thorne's estimate. To be sure, that $300,000 figure corresponds to the removal of only two of the three trestles on the property—however, because some of the comparable corridor sales considered by the court also involve property that had at least one rotting trestle and potentially, even soil contamination, the court believes that the cost of dealing with the third trestle is already reflected in the court's calculations via the court's use of these comparables.[28]

---

28. In this regard, Ms. Mitten testified on cross-examination, as follows:
   Q: Isn't it a fact, Ms. Mitten, that in the Capital Crescent Trail sale, Montgomery County, in purchasing its portion of that trail within its jurisdiction, did encounter a rotting trestle, dangerous condition type of situation in acquiring that leg of the trail.
   A: I believe that's true.

Mr. Thorne, however, posed the possibility that his cost estimate was too low based on the unwillingness of the adjacent property owner—the NPS—to allow plaintiff to bring heavy equipment and remove debris over its property. He suggested that an unspecified expense for this access should be factored into the remediation cost, perhaps even reflecting the expense of conducting the remediation using only the corridor itself. The court, however, finds these observations untenable for several reasons. It is far too expedient and self-serving for the NPS to claim now that they would not allow such access. The court's inspection of the property revealed that at least one established access route to the C & O canal lies under one of the deteriorating trestles, indirectly posing a safety hazard for the NPS, and that the failure of the other trestles, which sit upland of the canal over intermittent streams, would pose obvious drainage, erosion and even debris problems for the canal. Accordingly, the court believes that it is only reasonable to assume that if plaintiff or a hypothetical buyer had sought to remediate the problems on the property, the NPS would have readily allowed access to the Cabin John over its property based, if nothing else, on its own self-interest. This court views the testimony in the record to the contrary as incredible.

Accordingly, in the court's view, the preliminary before-taking value for the property of $1,383,468 must be reduced by $300,000, to reflect the ultimate before-taking value—*to wit*, $1,083,468.

### c. The After–Taking Value

█ The final step in this pavane requires the court to determine the value of the Cabin John after the taking. Here, the court is presented with an interesting and ironic situation. Plaintiff sets that after-value at $2,115,000, while defendant asserts that it is only $1. Though counterintuitive, the fact thus remains that if the court adopts defendant's after value, it increases plaintiff's recovery, and vice-versa. Based upon the record, this court, in fact, concludes that the actual after-taking value of the Cabin John is closer to defendant's value, than plaintiff's. As will be discussed, this conclusion is driven, in particular, by problems identified with Ms. Mitten's after-taking methodology.

In deriving her figure, Ms. Mitten used a so-called "across-the-fence methodology," in which she assumed that the adjoining property owners were all private individuals or entities that would be interested in augmenting their holdings with the corresponding segments of the property. The problem with this assumption is that, for the most part, the adjoining property owner is the United States. As such, Ms. Mitten's after-taking value methodology violates the basic principle that the "hypothetical sale should not be construed in a vacuum isolated from the actual facts." *Estate of Andrews v. Comm'r*, 79 T.C. 938, 956, 1982 WL 11197 (1982). In many ways this principle stems from the Supreme Court instruction in *Olson*, 292 U.S. at 257, 54 S.Ct. 704, that "[e]lements affecting value that depend upon events or combinations of occurrences which ... are not fairly shown to be reasonably probable should be excluded from consideration, for that would allow mere speculation or conjecture to become a guide for the ascertainment of value." It is one thing to assume a hypothetical buyer for the property as a corridor based upon the existence of interest in hiker/biker trails, but quite a different matter to assume that the property will be disaggregated and purchased by adjoining private property owners to augment their individual lots when, in fact, most of the adjoining

Q: Yeah. There is actually a trestle that required substantial rebuilding, did it not, over Rock Creek?
A. Yes.
Q: And because it was unsafe to walk on. Yeah. Now didn't the county get a concession off the purchase price that it paid to the C & O Railroad for the cost of rebuilding and making that structure so that they could use it as a hiker-biker trial.
. . . .

A: I think that would be an appropriate conclusion to draw.
Q: .... But you didn't make an allowance for that in this case?
A: Well, the reason I agree with it is if—think it reinforces the parallel between the acquisition of the Capital Crescent that had a trestle that was in some kind of disrepair that needed repair, and the price reflected that. That relates directly to the subject property.

property is actually owned in bulk by the United States. Unlike the pre-taking corridor use, such a post-taking use of the property is not reasonably probable and thus may not be considered.

By comparison, Mr. Thorne set the post-taking value of the property by studying sales involving impaired properties (*e.g.*, wetlands) and based thereupon derived an after-value for the Cabin John of $0.50 per square foot. In the court's view, this figure should apply to those portions of the property bounded by property owned by the United States. The record suggests that such property consisted of approximately 8.25 acres of the 12.37 acres of the property remaining after the physical taking[29], or 359,498.8 square feet. At $0.50 per square foot, this yields a partial value of $179,799.40. For the portion of the property that adjoins property not owned by the United States (essentially the property in Glen Echo and Brookmont), the court believes that the post-taking sale of property to Glen Echo again represents the best comparable. This disaggregating sale was made at a price of $1.90 per square foot. Multiplying this figure times the square footage of such property—4.12 acres or 179,467 square feet—yields a value for this portion of the property of $340,987. Adding the values of the two parcels together yields a preliminary after value of $520,786.40.

Both parties agreed that the cost of remediating the Cabin John must be subtracted from the after-value of that property, apparently based on the view that the hazards on the property may not be carved out and ignored, while the remainder is sold. For this purpose, the court believes that Mr. Thorne's estimate of $300,000 for remediation still holds true. Accordingly, the after value of the Cabin John is derived by taking the preliminary value of $520,786.40 and subtracting therefrom the remediation costs of $300,000, yielding an ultimate after-taking value of $220,786.40.

### 3. Redux

With the variables in the "before and after" equation now established, the court finds that the direct and severance damages occasioned by the taking here are calculated by subtracting from the before value of $1,083,468, the after value of $220,786.40. This simple calculation indicates that the damages awardable here are $862,681.60.

## III. CONCLUSION

The court need go no farther. After considering the evidence of the appraisers, as well as the other evidence of record, the court finds that plaintiff is entitled to be paid $862,681.60, with simple interest from the date of the taking, October 30, 1995. Plaintiff is also entitled to reasonable costs and expenses, including attorney fees, actually incurred because of this proceeding. 42 U.S.C. § 4654(c). Plaintiff and defendant shall endeavor to stipulate to those costs, expenses and attorney fees, and, if they so agree, shall file a joint statement listing the amount of such items with the court no later than September 27, 2002. Should the parties be unable to agree, plaintiff shall file with the court a bill of its costs, expenses and attorney fees, together with any necessary explanation or supporting documentation thereof, no later than September 27, 2002. Defendant shall then file its response to plaintiff's bill no later than October 11, 2002. Following a determination of such costs and fees, an appropriate judgment will be entered in this matter. Such judgment will vest in the United States the portion of the property taken, which shall be determined in accordance with part II. B. of this opinion.

**IT IS SO ORDERED.**

---

**29.** As discussed in part I.B., *infra*, the Court has adopted the plaintiff's figure of 129,580 square feet, or 2.98 acres, as the extent of the physical taking.